# United States District Court

Southern _____ DISTRICT OF _____ New York

JEFFREY SILVER

## AMENDED AND SUPPLEMENTAL SUMMONS IN A CIVIL CASE

V.

CASE NUMBER: 05-CV-00035 (RPP)

CHRISTINE KUEHBECK, THOMAS RYAN, CARL
BERNSTEIN, JOHN DOES 1 THROUGH 20
and JONATHAN S. ABADY

TO: (Name and address of defendant)

| | | | |
|---|---|---|---|
| **CHRISTINE KUEHBECK**<br>**9 Salt Meadow Lane**<br>**North Haven, New York** | **Det. THOMAS RYAN**<br>**c/o 19th Precinct**<br>**153 East 67th Street**<br>**New York, New York 10021** | **CARL BERNSTEIN**<br>**205 E. 70th Street**<br>**New York, New York** | **JONATHAN S. ABADY**<br>**545 Madison Avenue**<br>**3rd Floor**<br>**New York, NY 10022-4219** |

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Maurice W. Heller, Esq.
HELLER, HOROWITZ & FEIT, P.C.
292 Madison Avenue
New York, New York 10017

an answer to the complaint which is herewith served upon you, within _____ **20** _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

FEB 09 2005

CLERK

DATE

(BY) DEPUTY CLERK

Maurice W. Heller (MH-7996)
May Orenstein (MO-2948)
HELLER, HOROWITZ & FEIT, P.C.
292 Madison Avenue
New York, New York 10017
(212) 685-7600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JEFFREY SILVER,

                     **Plaintiff,**

          -against-

CHRISTINE KUEHBECK, THOMAS RYAN,
CARL BERNSTEIN JOHN DOES 1 THROUGH
20 and JONATHAN ABADY,

                     **Defendants.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**Index No. 05-CV-00035 (RPP)**

*VERIFIED FIRST*
*AMENDED AND*
*SUPPLEMENTAL*
*COMPLAINT*

*JURY TRIAL DEMANDED*

Plaintiff, Jeffrey Silver, by his attorneys, Heller, Horowitz & Feit, P.C., for his verified

first amended and supplemental complaint in this action, alleges as follows:

### JURISDICTION AND VENUE

1.    This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331

and 1332(a)(1). The matter in controversy exceeds the sum or value of $75,000, exclusive of

interests and costs.

2.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).



## PARTIES

3.     Plaintiff Jeffrey Silver ("Silver") is a citizen of the state of Nevada.

4.     Defendant Christine Kuehbeck ("Kuehbeck") is a citizen of the State of New York, residing at 9 Salt Meadow Lane, North Haven, New York.

5.     Defendant Thomas Ryan is a detective with the New York City Police Department and is, upon information and belief, a citizen of the State of New York.

6.     Defendant Carl Bernstein ("Bernstein") is a citizen of the State of New York, residing at 205 E. 70th Street, New York, New York.

7.     Defendants John Does 1 through 20 are police officers, police detectives and other employees of the City of New York.

8.     Defendant Jonathan S. Abady is an individual and, upon information and belief, a citizen of the State of New York.

## PRELIMINARY STATEMENT

9.     This is an action necessitated by outrageous and unlawful conduct. Defendants Bernstein and Kuehbeck coldly conspired to do Plaintiff grievous harm, and concocted a vicious scheme designed quite simply to destroy plaintiff, his reputation, career and very life. In the end, in addition to the numerous other wrongs set forth below, they maliciously arranged to have Plaintiff arrested, detained and charged with purported crimes they knew he never committed. Civil society should not tolerate such behavior.

10.     Co-incident with his numerous afflictions, Defendant Bernstein was obsessed with Plaintiff. The facts will show that Bernstein orchestrated an effort to harm Plaintiff from the inception of Bernstein's dating relationship with Defendant Kuehbeck in 2002. With typical

2

sense of entitlement, Bernstein utilized his notoriety and contacts first to perpetrate his own substantial wrongs, then pressured, cajoled, threatened and effectively bribed Defendant Kuehbeck to do her part to put the public face on the scheme. Kuehbeck, having both used Plaintiff and benefited from his aid, suddenly betrayed him without warning, turning on him black widow-like, supplied the final element to the conspiracy to dispatch Plaintiff through massive, shameless, multiple perjuries.

11.    The actions of Defendants and the damage they inflicted give rise to several causes of action: malicious prosecution, abuse of process, false arrest, violations of Plaintiff's civil rights, slander, intentional infliction of emotional distress, *prima facie* tort, tortious interference with business relationships and quantum meruit.

12.    Plaintiff and Defendant Kuehbeck were involved in a longstanding, private, eleven-year, passionate relationship. There is substantial tangible and specific physical evidence of this fact. They at one time early on informally agreed to marry, but Kuehbeck continued to have relationships with other partners, a pattern which she never abandoned. Nevertheless, Plaintiff and Kuehbeck remained always very close friends, mutually confided the events of their lives, indeed were sometimes virtual alter-egos. They saw each frequently, spoke often and traveled together. Kuehbeck frequently consulted Plaintiff about a variety of personal and business matters. She used him as a sounding board on numerous issues, including questions regarding Bernstein's bizarre conduct, pathological behavior and multiple afflictions, including bipolar disorder-like tendencies to grandiosity and extremes, pressures, dysfunctionality, evident laziness, lack of discipline, inability to concentrate, attention deficits, controlling, addictive-type obsessions about both her and Plaintiff. She complained about his sexual inadequacy. In

3

addition, she related to Plaintiff Bernstein's dependence on medication and psychiatric treatment and constant pressure on her to begin psychotherapy to deal with what he projected were her problems, namely seeing someone other than him.

13.    The relationship between Plaintiff and Kuehbeck continued unabated after Bernstein entered Kuehbeck's life. In fact, Kuehbeck remained freely intimate with Plaintiff right up to the final five days before her and Bernstein's most egregious act of invoking the criminal justice system as a tool to service their pathologies. Indeed, Bernstein was no stranger to the criminal justice system, having had his own arrest record.

14.    The affectionate relationship between Plaintiff and Kuehbeck is well-documented and established by specific tangible evidence, including intimate photos, recordings, multiple phone records, even DNA. The two also had a contractual business relationship. Even when, toward the latter part of the relationship, Kuehbeck began to date Defendant Bernstein, she purposefully continued seeing Plaintiff, confiding in him and seeking his advice.

15.    Notwithstanding that he was then only one of several suitors for Kuehbeck's attention, Bernstein behaved otherwise. He would not tolerate competition for Kuehbeck's affection. He began to interfere in Plaintiff's personal and professional life, utilizing, upon information belief, many personal and professional contacts for this craven purpose. Upon information and belief, his campaign included stalking, the use of agents to tail Plaintiff, obtaining private personal information about Plaintiff, intercepting private communications and disparaging Plaintiff by falsely attributing statements to Plaintiff. As Kuehbeck's relationship with Bernstein progressed, she nevertheless continually and repeatedly expressed to Plaintiff her

4

reservations about what she described to be Bernstein's needy and occasionally bizarre behavior, as complicated by his multiple apparent afflictions.

16.    Even after Bernstein and Kuehbeck purportedly married in July 2003, Kuehbeck, quite voluntarily and without prompting, continued to see Plaintiff. Although Kuehbeck had voluntarily sought Plaintiff's advice about a proposed prenuptial agreement, a fact that outraged Bernstein, Plaintiff did not immediately learn of this recent purported marriage. Indeed, within the first two weeks of the purported marriage, Kuehbeck twice had sexual trysts with Plaintiff. She also asked for, and received, cash gifts from him. The fact that Kuehbeck continued to see Plaintiff utterly unnerved Bernstein.

17.    Upon information and belief, Bernstein ratcheted up his stealth campaign of intercepting Plaintiff's personal e-mails, telephone conversations and correspondence, going so far as to steal Plaintiff's social security number. He continued to seek, upon information and belief, to defame Plaintiff to third parties. Bernstein stepped up his campaign with Kuehbeck as well. Upon information and belief, he began tailing her, pressuring her about her correspondence and telephone communications with Plaintiff, ordering her not to maintain any contact with Plaintiff and stealing her cell phone and phone messages. He found out about a securities fraud class action lawsuit that Plaintiff had conceived and organized on Kuehbeck's behalf, with Kuehbeck as name plaintiff, and he promptly began interfering with the work involved in the suit, pressuring the attorneys involved not to deal with Plaintiff. Moreover, he threatened Kuehbeck that he would not to perform his obligations under the prenuptial agreement, and threatened her with divorce.

5

18.     Bernstein then decided to nail the coffin of his self-perceived rival shut.
Bernstein, upon information and belief, induced Kuehbeck with a combination of financial
motives and coercive threats and pressure, together with Bernstein, to file a criminal complaint
with the New York City Police Department against Plaintiff. Both she and Bernstein knew the
complaint was completely false and utterly baseless. The affidavit lodged with the Criminal
Court, sworn to by Kuehbeck, was filled with lies. But Bernstein, upon information and belief,
utilized his influence to cause the police and the district attorney's office to act on a complaint
that was transparently bogus and wholly perjurious, to arrest Plaintiff. In her sworn statement,
Kuehbeck, among other things, claimed she had only had a brief relationship with Plaintiff in
1994. She then sought to smear Plaintiff, painting him as a supposed ten year stalker who was
harassing and threatening the couple. Both Defendants knew the phony claims were not only
false, but absurd.

19.     Plaintiff was ultimately able to provide overwhelming evidence of the massive
perjury and was successful in having the charges against him dismissed, but only after great
expense, pain and suffering. Plaintiff lost three months of his life to the two Defendants. His
chief tormentor, Bernstein, and Bernstein's now collaborator, Kuehbeck, have continued to lead
public lives seemingly unscathed. Detective Thomas Ryan who was, upon information and
believe, deliberately oblivious and indifferent to the truth, and despite being made aware of
material facts which wholly refuted the charges, performed no investigation at all. He was
instead taken in by Bernstein's notoriety and, upon information and belief, compelled by
Bernstein's supposed clout, to continue to do the two Defendants' bidding. The arrogance and
hubris that motivated the Defendants' actions should not go unpunished. The ultimate irony is

6

that Plaintiff was falsely charged for stalking and harassment. The only true "stalker" or "harasser" in this sordid story was Bernstein himself.

## FACTS COMMON TO ALL CLAIMS

### Plaintiff and Kuehbeck Meet and
### Commence Their Relationship

20.     Plaintiff is a graduate of Williams College and Columbia Law School. He has served as a foreign service officer of the United States, an aide to an Assistant Secretary of State, and, among other things was involved in intelligence work in liaison with the Defense Department and the CIA. He is believed to have then had the distinction of assignment as the youngest officer ever assigned to the elite political section of the U.S. Embassy in London. Later, he became a Wall Street lawyer, a senior investment manager, and the CEO of a corporation. He is the father of four grown children each of whom is quite successful.

21.     In 1993, Plaintiff began to date Christine Kuehbeck and a passionate relationship began. She had been a model in Germany and had been earlier married for nine years to a then German rock star. At the time they started seeing each other Kuehbeck was seeing two other men, but did not tell Plaintiff. This pattern of deception by Kuehbeck continued throughout Plaintiff's and Kuehbeck's long relationship. Indeed, this was Kuehbeck's *modus operandi,* to see various men at the same time. Plaintiff otherwise greatly admired Kuehbeck's many qualities. At one point early in their relationship, Plaintiff and Kuehbeck agreed to get married, but Kuehbeck's old habits did not die – Kuehbeck continued to have relationships with other men and when Plaintiff found out, he broke off the informal engagement.

22.     While marriage was no longer the goal, the relationship between Plaintiff and Kuehbeck continued for over eleven years. Plaintiff and Kuehbeck also established a business

7

relationship. Kuehbeck asked Plaintiff to be one of her investment advisers, and gave him

discretionary authority over portions of her assets. While Plaintiff at times made a great deal of

money for her in a bear market, not all of his picks were winners. Kuehbeck lost substantial

money when the value of shares in Genesis Microchip, Inc. dropped sharply. In an effort to

recoup her losses, Plaintiff conceived and organized a class action lawsuit against the company.

He hired a noted class action law firm, Wolf Popper LLP, which shared the view that securities

fraud on investors had occured, and agreed to serve as consultant, with her knowledge and

consent, and for Kuehbeck to act as lead plaintiff in the action. In connection with this lawsuit,

Kuehbeck gave Plaintiff power of attorney to act on her behalf.

### Kuehbeck Begins to Date Bernstein
### and Trouble for Plaintiff Begins

23.     In or about late April 2002, Defendant Bernstein began to date Kuehbeck.

Bernstein was no stranger to Plaintiff, as in the late 1990's, Bernstein had attempted to pick up

Plaintiff's 25-year-old daughter at a party, in front of Plaintiff. As it was not Kuehbeck's style to

be monogamous, she continued her relationship with Plaintiff and dated others while she was

dating Bernstein. But Kuehbeck began to disclose to Plaintiff certain disturbing facts about

Bernstein which should, in retrospect, have made Plaintiff more wary about what Bernstein was

capable of doing to someone who Bernstein perceives as a threat.

24.     Keuhbeck told Plaintiff that Bernstein had been in serious therapy for 25 years

and described her concerns about his pressure to force her into therapy for her "problem", which

in his view consisted of seeing anyone else but him. She noted Bernstein's history with drugs,

alcohol and sex addictions, and that he regularly takes the medication, Wellbutrin. She described

to Plaintiff numerous symptoms that would indicate that Bernstein was suffering from adult

8

attention deficit disorder, addictive personality and other psychiatric disorders, including indications of bi-polar disorder, a serious illness. Bernstein's past enormous appetite for sex was well-known and well-documented. Kuehbeck told Plaintiff, however, that he was sexually inadequate. She complained that Bernstein was lazy, noting specifically that Bernstein barely wrote a word of a book about Hilary Clinton, for which published reports have shown that had taken a $500,000 advance in January 1999. She complained about, and Plaintiff personally observed, Bernstein's needy and obsessive behavior through many instances of ten to twelve telephone calls to her within fifteen minute time spans, while Kuehbeck and Plaintiff were engaged in skiing, tennis or trysts together.

25.     Despite her seeing Bernstein, Kuehbeck freely chose to continue her relationship with Plaintiff, which remained intimate and intensely physical. In May, 2002, Plaintiff and Kuehbeck traveled on the West Coast together, and later in the month, attended a charity ball. While Kuehbeck freely disclosed Bernstein's pathologies to Plaintiff, she was less candid about the depth of her relationship with Bernstein. She did not make it sound like anything more than a casual one, or more serious than any of the other relationships in which Kuehbeck had engaged during her 11 year close friendship with Plaintiff.

26.     Soon, however, events began to occur which bore the mark of insanely jealous and vindictive rival with an overwhelming sense of personal entitlement. Within only weeks of Bernstein's involvement, on or about June 19, 2002, Plaintiff received a letter from a lawyer named Ira Garr claiming to represent Bernstein and Kuehbeck and alleging that Plaintiff was somehow stalking and harassing them. A similar letter was apparently sent to Rolf Heitmeyer, another man who Kuehbeck had been seeing at the same time. Plaintiff confronted Kuehbeck,

9

who denied knowing anything about the letter nor that Garr, whom she stated she had never heard of, represented her. Plaintiff, accordingly, responded twice to this letter, and never heard from Mr. Garr again.

27.    Following the Garr incident, things between Plaintiff and Kuehbeck returned to normal, or so it seemed. In September 2002, Kuehbeck met Plaintiff in London,. Throughout the last half of 2002, Plaintiff and Kuehbeck continued to see each other on a regular basis, having regular sexual liaisons in Kuehbeck's apartment, primarily between the hours of 6:00 and 9:30 in the morning. In addition, in late 2002 and well into 2003, Kuehbeck sent Plaintiff e-mails and personally-created cards expressing her deep affection for Plaintiff.

28.    The tempest, however, was continuing to brew. Kuehbeck began to tell Plaintiff that Bernstein was boasting about his "skills" as an investigative reporter and his network of connections to snoop around both Plaintiff's whereabouts and Plaintiff's and Kuehbeck's personal and legal affairs. She expressed anxiety that she was being followed by Bernstein's agents, and that Bernstein was driving around the neighborhood surveilling her and Plaintiff, at luncheon trysts at an apartment Plaintiff used when in Manhattan. At Kuehbeck's express request, on June 12, 2003 Plaintiff wrote a letter to Bernstein referring to the securities class action and requesting that Bernstein stay out of his and Kuehbeck's legal affairs.

29.    The full extent of Bernstein's intrusive activities did not become apparent to Plaintiff until later. Nevertheless, Kuehbeck continued to rely secretly on Plaintiff for advice about all aspects of her relationship with Bernstein and his various problems. She stated that she resented many of his pressures, describing in one instance his demand that she leave her sickbed in a snowstorm to fly at night to Washington D.C. to be with him during a visit to his ailing

father. Bernstein asserted that her ticket was pre-paid, but when Kuehbeck reluctantly complied and went to the airport she was required to purchase the ticket herself. She also confided his constant pressure to get married and her own divided view on the subject. Eventually, Kuehbeck gave Plaintiff a copy of a pre-nuptial agreement Bernstein demanded she sign and asked for it to be reviewed.

30.    Eventually Kuehbeck told Plaintiff about a short trip she had taken with Bernstein to Iceland over the July 4, 2003 Holiday. But Kuehbeck neglected to inform Plaintiff that, during their trip to Iceland, she and Bernstein were purportedly married. When Plaintiff eventually learned the news that this event had occurred, Plaintiff suggested to Kuehbeck that their relationship should end. But Kuehbeck claimed her purported marriage had no effect on her desire to continue her relationship with Plaintiff. She even asserted that it was not even clear that she had actually been married. Plaintiff advised her to obtain copies of the purported marriage documents from Bernstein. If Kuehbeck did so, she never showed them to Silver. Despite everything, in late 2003 early 2004, Kuehbeck continued to meet Plaintiff when in town for coffee, walks, and frequent sexual trysts.

31.    According to Kuehbeck, Bernstein's ire against both her and Plaintiff was building, and the level of his snooping into Plaintiff's and Kuehbeck's affairs increased commensurately. She stated that he was breaking into e-mails and that her previous reluctance to write Plaintiff had become an absolute requirement. She told Plaintiff that Bernstein stated to her "you guys are leaving a paper trail." While Kuehbeck's phone conversations with Plaintiff continued, even here Kuehbeck stated that Bernstein was stealing her cell phone to determine with whom she was in contact. At Kuehbeck's urging, on January 15, 2004, Plaintiff again wrote

11

a letter to Bernstein demanding that he stop interfering in his and Kuehbeck's business affairs. Again, at this point, Plaintiff could only guess at the full scope of Bernstein's intrusions, and was otherwise reluctant to have anything directly to do with Bernstein, despite Kuehbeck's constant urgings that the two meet.

32.    Kuehbeck continued to see Plaintiff regularly.  On May 6, 2004, Kuehbeck attended a luncheon with Plaintiff given by the Paris American Club at La Cote Basque, a restaurant in Manhattan.  On May 17, 2004, Kuehbeck sent an e-mail to Plaintiff reminding him about their fun times together including a certain "Lake."

33.    Until June 2004, with certain exceptions Plaintiff largely knew of Bernstein's "interference" activities from his conversations with Kuehbeck.  This was about to change.  In late June 2004, a letter was hand delivered to Plaintiff addressed to "Silver, c/o Ozeroff." Plaintiff had never told Kuehbeck or anyone else, the identity of the apartment owner where he stayed when in New York.  Yet the sender of this letter apparently knew.  Upon inspection, Plaintiff realized that the letter was from Bernstein, and returned it unopened.  The incident recalled lawyer Garr's bizarre letter written at Bernstein's request two years earlier which had been hand delivered to Plaintiff, also at a location that Plaintiff had not previously disclosed.

34.    Now, the depth of Bernstein's "investigation" into Plaintiff's private affairs was becoming apparent.  Plaintiff also learned from Wolff Popper that prior to this period Bernstein had begun inserting himself in the class action securities suit brought in Kuehbeck's name, and had repeatedly urged them privately to ignore and cease dealing with Plaintiff in any respect. Plaintiff has since heard nothing from the firm.

35.     As Plaintiff discovered later, the letter contained a "Notice of Revocation of Power of Attorney," purportedly signed by Kuehbeck. Upon information belief, the notice was drafted by Bernstein, who compelled Kuehbeck to sign through a combination of threats and the refusal to comply with obligations of their pre-nuptial agreement. This notice purported to withdraw the power of attorney that Kuehbeck had given to Plaintiff in connection with activity in her behalf in the securities fraud class action and purported to discharge Plaintiff from any further involvement, meaning that his agreement with Wolf Popper could no longer be performed. Not only was the letter hand delivered to Plaintiff, but a copy of the purported notice was faxed to one of Plaintiff's unrelated business colleagues in a transparent effort to embarrass Plaintiff.

36.     Plaintiff expressed his considerable disappointment to Kuehbeck for these actions, noting that she had benefited from hundreds of hours of work in her behalf before jettisoning him. Kuehbeck told Plaintiff she did it only to get Bernstein "off her back," as he was now keeping her up all night long, obsessing about Plaintiff, arguing with her without interruptions, threatening. She informed Plaintiff that she was ordered to stop seeing him. Plaintiff asked if that was her wish and she replied "that's what he says, not what I say."

37.     In response, on June 20, 2004, Plaintiff wrote to Bernstein demanding that Bernstein "stay away from me," and warning Bernstein of possible civil and criminal consequences if he persisted in his activities, which were plainly designed to harm him. Upon information and belief Bernstein's personal and office phone records should corroborate the extent at this point of his stalking of Plaintiff. As Plaintiff later found out, Bernstein by this point had begun to turn Kuehbeck against Plaintiff, using the best language that Kuehbeck

13

understood – money. In late June and early July 2004, Bernstein, the *quid pro quo* revocation of

power of attorney issued, finally conveyed part ownership to Kuehbeck of a newly acquired

home that he had purchased in Southampton, Long Island. Bernstein had initially represented to

her that it had been a joint purchase as required under the pre-nuptial agreement, but had instead

purchased it alone, unbeknownst to Kuehbeck, who told Plaintiff in April that she was "on the

deed" while asking him to verify that fact. Bernstein also finally paid her $75,000, money that

was also due under the prenuptial agreement, but that he had, upon information and belief,

threatened not pay. This had been a source of worry for Kuehbeck. Upon information belief, the

transfer of the property and the $75,000 payment were used by Bernstein to induce Kuehbeck

into withdrawing the power of attorney from Plaintiff.

38.     Kuehbeck, however, continued to call Plaintiff, but now her motives were suspect.

On July 16, 2004, Kuehbeck called Plaintiff and asked him if he was going to the Lake the next

day and, if so, at what time. Plaintiff said that he planned to go to the Lake at approximately

noontime, but said that he did not wish to see her and Bernstein there. Kuehbeck told Plaintiff

that was fine, since she and Bernstein were not going to be there before 6:00 p.m. Plaintiff went

swimming as planned, but as he was walking back from the Lake, at approximately 1:15 p.m., he

saw Kuehbeck and Bernstein walking toward him. Kuehbeck immediately ducked into the ladies

room. Bernstein then approached Plaintiff, and said, in a threatening voice, "you and I are taking

a walk." Plaintiff told Bernstein that he had nothing to say to him, and kept walking. As

Plaintiff walked away, Bernstein turned to Plaintiff and said "I'm going to have you taken care

of." Plaintiff felt threatened.

39.    Afterward, Kuehbeck, called Plaintiff several times to ask him if he was either going to sue Bernstein or bring criminal charges against him. Plaintiff told Kuehbeck that steps might be taken against Bernstein, but he did not feel comfortable sharing his plans with Kuehbeck. Plaintiff, who feared for his safety, decided to report the incident at the Lake to the police. According, he went to the 19th Precinct in Manhattan and filed a complaint against Bernstein with a detective Morales.

40.    On July 29, 2004, Kuehbeck and Plaintiff planned their own swim at the lake. Kuehbeck left Plaintiff a voicemail stating that she was no longer certain she could meet him at the Lake as "Carl called and said he was coming back early from Boston." At that time, Bernstein was allegedly at the Democratic National Convention in Boston. Plaintiff, who should have known better, called her and was told she would indeed be able to meet as planned. On July 30, Plaintiff and Kuehbeck met at the Lake. The two met to go swimming, which led, inevitably, to sex. Kuehbeck told Plaintiff that Bernstein had several "gigs" lined up for the early fall and that notwithstanding his threats, she wanted to continue to see him, but had to be careful to "pick her spots."

41.    But three days later, on August 2, 2004, Kuehbeck suddenly told Plaintiff, in a cold and aloof voice, that Bernstein had found out about the tryst at the Lake, was livid, and had been screaming at and psychologically abusing her all weekend. The two agreed to discuss the matter over coffee the next day. Plaintiff planned to inform her that he did not wish to see her anymore, and to return various documents, letters, and memorabilia about the two.

42.    The next day, on August 3, 2004, Plaintiff went to Starbucks, as planned, and waited for Kuehbeck. She never appeared. Plaintiff finally called Kuehbeck, who claimed that

15

"she could not get rid of Carl." Kuehbeck then suggested that they meet at Margot's restaurant at 2 p.m. As planned, at 2 p.m., Plaintiff went to Margot's and waited. Kuehbeck did not appear. His patience wearing extremely thin, Plaintiff called Kuehbeck again, and she promised to meet him at Annie's restaurant at 5 p.m. Incredibly, Kuehbeck stood Plaintiff up a third time in the same day. Plaintiff, whose agitation had grown to anger, drank the two drinks that he had ordered for both of them, called and complained to Kuehbeck about her evident lack of consideration and disrespect.

### Bernstein and Kuehbeck Have Plaintiff
### Arrested, Detained and Prosecuted

43.     At this point, Bernstein saw the opportunity to finally destroy his self-perceived nemesis. On the morning of August 4, 2004, a police report was filed with the 19th precinct in Manhattan accusing Plaintiff of "aggravated harassment" and "stalking" against Kuehbeck, both of which are crimes under New York State law. This was the very same precinct in which Plaintiff had filed his earlier complaint against Bernstein. Upon information belief, the report was jointly filed by Bernstein and Kuehbeck.

44.     On August 9, 2004, the following Monday, Defendant Detective Ryan and another detective showed up at an office used part-time by Plaintiff and told the receptionist that they wanted to speak to Plaintiff to "follow up on his earlier complaint." Plaintiff was extremely busy that day, but eventually walked downstairs and found the two detectives in a parked car outside the office. Plaintiff asked them what was up, and they asked him to accompany them to the police station. Plaintiff did so, since the detectives conveyed the impression that it was for the purpose of discussing Plaintiff's complaint. Plaintiff was then told by a Detective Ryan that he was going to arrest Plaintiff for "stalking and harassment." Needless to say, Plaintiff was

flabbergasted. Plaintiff related a number of facts to Detective Ryan, including the fact that only five days earlier, he and Kuehbeck had met at the Lake for a swim and had consensual sex. Fortunately, Kuehbeck's message arranging for the tryst was preserved on Plaintiff's answering machine, and he played the message for the police. Detective Ryan was apparently surprised, and told Plaintiff that he could leave because he now had to call Bernstein and Kuehbeck who were in Europe.

45.     The following day, on August 10, 2004, Plaintiff decided to go back to the precinct to try to offer additional evidence that the complaint was nonsense. Detective Ryan told Plaintiff that he had called Kuehbeck and Bernstein, and Bernstein had claimed Plaintiff was the subject of an arrest warrant in California, a slanderous fabrication. He then told Plaintiff that Bernstein and Kuehbeck wished to press charges, and that he therefore had no choice but to arrest Plaintiff. Plaintiff asked the precise basis upon which he was being arrested, and Ryan answered that it was on the basis of "many threatening phone messages." Plaintiff, puzzled, asked Detective Ryan if he found such supposed messages threatening, and Ryan replied "not to my ears, but when a woman is involved we tend to bend over backwards." Upon information and belief, there were no such "messages." Ryan then said that "Bernstein is all over the case, and I'm going to recommend that the ADA interview her separately." He declined to delay his decision pending an investigation of the actual facts. Plaintiff was placed in a detention area in the police station behind a locked door, until his release later that day.

46.     The matter was referred to the Manhattan District Attorney's office, where on August 19, 2004, Kuehbeck executed an affidavit swearing, *inter alia*, that after only a brief relationship with Plaintiff in 1994, he had engaged in ten years of stalking her and had

17

specifically threatened her and Bernstein. The affidavit went on to describe various purported incidents over the ten years in an effort to support her charges. Each and every element of her sworn statement is a fabrication, and the entire document stands as a transparent, demonstrable and monumental perjury.

47.    On August 20, 2004, Judge Anthony Ferrara issued an order of protection ordering Plaintiff to stay away from Kuehbeck and Bernstein. The order of protection was served on Plaintiff on August 23, 2004. In effect, the real stalker managed, ironically, to have himself named for protection.

48.    During the next highly stressful, nightmarish period of almost three months, Plaintiff organized his defense, hired counsel, engaged in an exhaustive investigation on his own that resulted in a detailed presentation of the actual facts and the reality of their actual relationship to the District Attorney's office. The presentation noted, among other things:

a)    Many revealing photos of Kuehbeck from late 1996-2003 that were taken with Kuehbeck's full knowledge and consent in connection with their intimate relationship;

b)    Recorded corroboration from numerous sources of their early morning and late night visits, then Kuehbeck's continuing secret visits right up to the time of her perjured affidavit;

c)    Five recordings, four of them quite recent, of Kuehbeck's affectionate messages to Plaintiff, three of them referring to trysts, including one which took place only five days before she filed her bogus complaint;

d)    Copies of checks Kuehbeck cashed in connection with the visits;

e)    Third-party corroboration of their recent public dates;

f)    Unmistakable very recent DNA evidence of a sexual nature;

g)    Phone records of close to 100 calls from Kuehbeck in the last couple of years from her office and cell phone;

18

h)    Certain endearing e-mails from Kuehbeck to Plaintiff;

i)    An affectionate, relatively recent card Kuehbeck created for Plaintiff;

j)    Evidence of her confiding and consultation with regard to the pre-nuptial agreement and Bernstein's afflictions, intrusions and threats;

k)    Travel together over the same ten year period, in some cases verifiable by Kuehbeck's mother who traveled with them, that can be corroborated by simultaneous travel documents, or third party testimony, which in recent years included trips to Virginia, Massachusetts, Northern Connecticut, Maine, Upstate New York, Pennsylvania, California, Colorado, France, Germany, Switzerland, and London during the time she was seeing Bernstein.

l)    Upon information and belief, the existence of Bernstein's office, personal and cellular telephone records.

49.    The District Attorney's Office, brought to consider the scope and breadth of this evidence, was obliged to confront Kuehbeck. Plaintiff was eventually directly told that this meeting was "not pleasant" for Kuehbeck, and in a masterpiece of understatement, that they had finally realized they had "a lying woman on their hands." The charges were then dismissed and the order of protection vacated.

50.    Throughout this entire story from beginning to end, Defendant Kuehbeck never once told Plaintiff she no longer wanted to see him. Not once.

### FIRST CLAIM FOR RELIEF
#### (Malicious Prosecution)

51.    Plaintiff repeats and realleges the allegations in paragraphs "1" through "50" herein.

52.    On or about August 4, 2004, Defendant Kuehbeck swore to a criminal complaint filed with the New York City Police Department which stated, upon information and belief, that she had been subjected to "harassment" and "stalking" by Plaintiff.

53.     Kuehbeck swore to the complaint with the intent of causing Plaintiff to be arrested and prosecuted for two counts of aggravated harassment in the second degree and one count of stalking in the fourth degree.

54.     On or about August 19, 2004, Kuehbeck swore to an affidavit, restating her claims, in detail, that she was subject to "harassment" and "stalking" by Plaintiff over a ten year period.  Each and every element of such affidavit was untrue and perjurious.

55.     Kuehbeck knew the allegations in the sworn complaint and in the affidavit to be totally false, and that Plaintiff did not commit the crimes described in the sworn complaint and the affidavit.

56.     Upon information and belief, Defendant Bernstein acted in concert with Kuehbeck in the filing of the sworn complaint and the affidavit.  Bernstein, individually and in concert with Kuehbeck, determined that such a false sworn complaint and affidavit would be filed.  Bernstein knew that the allegations in the sworn complaint and the affidavit were totally false, and that Plaintiff did not commit any such crimes.  Bernstein hovered over Kuehbeck throughout the process and sought directly to intercede with the Police.

57.     Bernstein, individually and in concert with Kuehbeck, utilized his influence with the New York City Police to procure Plaintiff's arrest.  In this regard, the New York City Police followed Bernstein's and Kuehbeck's instructions with respect to whether to arrest Plaintiff, when and where to arrest him, and what to charge him with.

58.     Upon information and belief, Bernstein and Kuehbeck, individually and in concert, also used their influence on other persons to enlist them to pressure the police and the District Attorney to arrest, imprison, indict and convict Plaintiff.  Upon information and belief,

20

such third parties asserted actual, or attempted, pressure upon the police and the District Attorney to arrest, imprison, indict and convict Plaintiff.

59.     Bernstein and Kuehbeck acted in concert to procure a protective court order against Plaintiff in which Bernstein, knowing the extent of his own stalking of and interference with Plaintiff, nevertheless had himself named.

60.     Bernstein and Kuehbeck, individually and in concert, acted with malice in filing the false sworn complaint and affidavit, in procuring the arrest and detention of Plaintiff, and in attempting to procure the indictment and conviction of Plaintiff.

61.     Neither Bernstein nor Kuehbeck had probable cause to believe that there were sufficient grounds upon which to commence and maintain criminal proceedings against Plaintiff for two counts of aggravated harassment in the second degree and one count of stalking in the fourth degree as outlined in the sworn complaint and affidavit.

62.     In fact, the attempts made by Bernstein to procure the criminal arrest and prosecution of Plaintiff were motivated solely by rage, sexual jealously and the desire for retribution against Plaintiff.

63.     The resulting criminal proceedings against Plaintiff were terminated in his favor on the merits.

64.     As a result of these acts, which amounted to malicious prosecution by Defendants Bernstein and Kuehbeck, Plaintiff suffered damages including, but not limited to, (i) legal fees and expenses incurred in his defense, (ii) damage to his reputation in the business community, and (iv) pain and suffering.

### SECOND CLAIM FOR RELIEF
### *(Abuse of Process)*

65.     Plaintiff repeats and realleges the allegations in paragraphs "1" through "64" herein.

66.     On or about August 4, 2004, and subsequently on or about August 19, 2004, Kuehbeck and Bernstein used regularly issued criminal process, namely a criminal complaint and an affidavit, for the purpose of procuring Plaintiff's arrest, detention and prosecution.

67.     Kuehbeck and Bernstein used such criminal process with the intent of doing harm to Plaintiff.

68.     In using such criminal process, Kuehbeck and Bernstein had no excuse or justification, and used such process in a perverted manner to obtain a collateral objective.

69.     As a result of the abuse of process by Kuehbeck and Bernstein, Plaintiff suffered damage as hereinabove alleged.

### THIRD CLAIM FOR RELIEF
### *(Intentional Infliction of Emotional Distress)*

70.     Plaintiff repeats and realleges the allegations in paragraphs "1" through "69" herein.

71.     On or about August 4, 2004, Defendants Bernstein and Kuehbeck, individually and in concert, commenced a course of conduct directed at Plaintiff, which included, *inter alia*, the filing of a false criminal complaint, the actual procurement of his arrest and detention, attempts to procure indictment and conviction, constituting extreme and outrageous conduct.

72.     Bernstein and Kuehbeck, individually and in concert, intended by their extreme and outrageous conduct to cause the distress and suffering of Plaintiff or knew that such conduct would cause him distress and suffering.

73.     As a result of the extreme and outrageous conduct of Bernstein and Kuehbeck, Plaintiff has suffered severe emotional distress and has been damaged as hereinabove alleged.

### FOURTH CLAIM FOR RELIEF
### (Prima Facie Tort)

74.     Plaintiff repeats and realleges the allegations in paragraphs "1" through "73" herein.

75.     On or about August 4, 2004, Bernstein individually, and in concert with Kuehbeck, commenced a course of conduct directed at Plaintiff with the intent and purpose of harming Plaintiff.

76.     Bernstein individually utilized personal contacts, deceit and artifice to (i) access and monitor Plaintiff's private communications and records, (ii) steal Plaintiff's social security number and other confidential identity-related information, (iii) threaten plaintiff directly and through third parties and (iv) communicating with third parties for the purpose of causing Plaintiff economic harm.

77.     In addition, Bernstein, in concert with Kuehbeck, caused (i) the filing of a sworn complaint in which Kuehbeck falsely alleged that Plaintiff had been "harassing" and "stalking" her; (ii) attempted to procure, and caused, the arrest and detention of Plaintiff by the New York City Police Department; and (iii) upon information and belief, enlisted the assistance of other persons to influence the police and the district attorney to arrest, imprison, indict and convict Plaintiff.

23

78.     At all relevant times, Bernstein and Kuhbeck knew that the sworn allegations of criminal conduct made by Kuehbeck were totally false.

79.     Bernstein and Kuehbeck were and remain without any excuse or justification for their respective acts directed at Plaintiff with the intent and purpose of causing him harm.  Such acts were committed by Bernstein and Kuehbeck for reasons of malice against Plaintiff and for no other reason.

80.     As a result of the course of conduct of Bernstein and Kuehbeck comprised of acts intended to cause harm to Plaintiff, which acts were committed without excuse or justification, Plaintiff has been harmed and has incurred damages as hereinabove alleged.

### FIFTH CLAIM FOR RELIEF
#### (Tortious Interference with Business Relations)

81.     Plaintiff repeats and realleges the allegations in paragraphs "1" through "80" herein.

82.     Bernstein and Kuehbeck knowingly and intentionally interfered with Plaintiff's contractual and business relations with the Wolf Popper firm by, *inter alia*, (i) Bernstein's repeatedly communicating with individuals at the Wolf Popper firm to convince them to sever their relationship with Plaintiff in connection with the securities class action litigation in which Kuehbeck serves as name Plaintiff and (ii) orchestrating Kuehbeck's withdrawal of the power of attorney issued in favor of Plaintiff.

83.     In so doing, Bernstein and Kuehbeck acted purposefully and knowingly and with the intent of harming Plaintiff.  The Defendants' acts did, in fact, cause harm to the Plaintiff in that his business arrangement with Wolf Popper was terminated.

24

84.     By reason of Bernstein's and Kuehbeck's tortious conduct, Plaintiff has been damaged in an amount to be determined at trial, but reasonably believed to be in excess of $250,000.

85.     Defendants' conduct in interfering with Plaintiff's contractual and business relations has been willful, wanton and malicious. Accordingly, Plaintiff is also entitled to punitive damages.

### SIXTH CLAIM FOR RELIEF
#### (Quantum Meruit)

86.     Plaintiff repeats and realleges the allegations in paragraphs "1" through "84" herein.

87.     In the course of conceiving, researching and preparing the securities class action lawsuit in which Kuehbeck is the name plaintiff, Plaintiff spent hundreds of hours working on Kuehbeck's behalf and on behalf of the class that Kuehbeck represents.

88.     If the contractual arrangement between Plaintiff and Wolf Popper has either terminated been rendered impossible to perform on the wrongdoing of Defendants Bernstein and Kuehbeck, Plaintiff has still rendered services to Kuehbeck under circumstances which are sufficient to support an implied promise to pay for such services.

89.     Accordingly, Plaintiff is entitled to recover as damages the reasonable value of the services performed in an amount to be determined at trial, but reasonably estimated to be not less that $150,000.

25

### SEVENTH CLAIM FOR RELIEF
#### (Assault)

90.    Plaintiff repeats and realleges the allegations in paragraphs "1" through "89" herein.

91.    On July 17, 2004, at the "Lake," Bernstein approached Plaintiff, and said, in a threatening voice, "you and I are taking a walk." Plaintiff told Bernstein that he had nothing to say to him, and kept walking. As Plaintiff walked away, Bernstein turned to Plaintiff and said "I'm going to have you taken care of."

92.    Bernstein's conduct constituted a hostile assault that threatened to damage Plaintiff's person. Bernstein intentionally, knowingly, maliciously and willfully intended to inflict personal injury on Plaintiff, or to put that Plaintiff in apprehension of physical harm.

93.    Bernstein transmitted to Plaintiff the reasonable impression that he was going to use means at his disposal to harm Plaintiff physically.

94.    Plaintiff was damaged by Bernstein's conduct, in that he feared for his bodily safety, and suffered humiliation, pain, anxiety discomfort, and inconvenience and mental anguish.

### EIGHTH CLAIM FOR RELIEF
#### (Negligence)

95.    Plaintiff repeats and realleges the allegations in paragraphs "1" through "93" herein.

96.    To the extent Bernstein did not have actual knowledge of the falsity of the allegations in the criminal complaint and sworn affidavit filed by Kuehbeck, Bernstein negligently failed to use ordinary care in investigating Kuehbeck's charges before participating in

any scheme to file such complaint and affidavit and procuring Plaintiff's arrest, detention and prosecution.

97.     The injuries suffered by Plaintiff on account of the arrest and imprisonment procured by Bernstein, as hereinabove alleged, were proximately caused by Bernstein's negligent conduct.

### NINTH CLAIM FOR RELIEF
*(Slander)*

98.     Plaintiff repeats and realleges the allegations in paragraphs "1" through "97" herein.

99.     According to information provided to Plaintiff by Kuehbeck, in or about April 2002 and continuing at least through August 2004, Defendant Bernstein embarked upon a campaign intended to impugn the reputation of Plaintiff.

100.     Upon information and belief, Bernstein's campaign of slander involved making numerous disparaging statements to third parties about Plaintiff including, but not limited to, that Plaintiff is a "stalker," that he is "crazy," and that his is "harassing" Kuehbeck and Bernstein. While, upon information and belief, Bernstein made such statements to a number of third parties, Plaintiff can specifically identify an individual named Ira Garr, who was purportedly hired by Bernstein to send threatening letters to Plaintiff.

101.     Bernstein made these statements knowing that they were utterly baseless, false and, in fact, simply the product of Bernstein's own paranoid obsessions.

102.     Bernstein's activities in seeking to defame Plaintiff caused plaintiff to suffer damage to his reputation, and also caused him mental and emotional distress and suffering.

103.    Accordingly, Bernstein is liable to Plaintiff for damages including, but not limited to, damage to his reputation, and pain and suffering.

## TENTH CLAIM FOR RELIEF
### (Slander)

104.    Plaintiff repeats and realleges the allegations in paragraphs "1" through "103" herein.

105.    At various times within the past twelve months, in a continuing effort to cover up the extent of her true relationship with Plaintiff, Kuehbeck has made numerous defamatory statements to third parties concerning Plaintiff including, but not limited to, that Plaintiff "tried to kill her."

106.    Kuehbeck made these statements knowing that they were utterly baseless and false.

107.    Kuehbeck's activities in seeking to defame Plaintiff caused plaintiff to suffer damage to his reputation, and also caused him mental and emotional distress and suffering.

108.    Accordingly, Kuehbeck is liable to Plaintiff for damages including, but not limited to, damage to his reputation, and pain and suffering.

## ELEVENTH CLAIM FOR RELIEF
### (Malicious Prosecution, False Arrest and Imprisonment)

109.    Plaintiff repeats and realleges the allegations in paragraphs "1" through "108" herein.

110.    At all relevant times, Defendant Ryan was a duly appointed, employed and acting police officers, detectives and other employees of the of the City of New York, a governmental subdivision of the State of New York.

111.    Upon information and belief, commencing on or about August 4, 2004, Bernstein and Kuehbeck contacted, or arranged to have contacted, one or more police officers, detectives or other employees of the City of New York for the purpose of procuring the unlawful arrest, detention and imprisonment of Plaintiff.

112.    Upon information and belief, Defendant Ryan and one or more of Defendants John Does 1-20 agreed to assist Bernstein and Kuehbeck in their endeavor.

113.    Upon information and belief, on or about August 4, 2004, Defendant Ryan conducted an interview of Bernstein and Kuehbeck during which Kuehbeck falsely alleged that Plaintiff had been "stalking" and "harassing" her.

114.    Upon information and belief, Defendants Ryan and John Does 1-20 assisted Bernstein and Kuehbeck in the filing of a sworn complaint containing patently false allegations regarding Plaintiff.

115.    On or about August 9, 2004, Defendant Ryan confronted Plaintiff with the intent to arrest him.  However, Plaintiff provided sufficient information to Ryan showing that the claims of Defendants Bernstein and Kuehbeck were bogus and Ryan determined to release Plaintiff.  Notwithstanding a clear duty to commence a thorough investigation, Ryan then merely contacted the two Defendants who repeated their desire that he pursue the arrest.

116.    Detective Ryan falsely stated to Plaintiff that he had listened to a series of purported threatening messages left for Defendants Kuehbeck and Bernstein by Plaintiff.  Upon information and belief, on or about August 10, 2004, Defendants Ryan and John Does 1-20 took steps to arrange for the illegal arrest of Plaintiff on charges of two counts of aggravated harassment in the second degree and one count of stalking in the fourth degree.

117.    Upon information and belief, Detective Ryan and John Does 1-20 knew that the account of events provided by Bernstein and Kuehbeck in Kuehbeck's sworn complaint and affidavit were false to the extent that such account alleged criminal conduct on the part of Plaintiff, and lacked probable cause to arrest him.

118.    Upon information and belief, Defendants Ryan and John Does 1-20 knew that no reasonable basis existed to support the belief that Plaintiff had committed the crime for which he was charged.  Moreover, Defendants Ryan and John Does 1-20 were aware that Plaintiff and Defendants Bernstein and Kuehbeck knew each other, and Defendants Ryan and John Does 1-20 were therefore on notice that they had additional responsibilities to further investigate the complaint.

119.    Upon information and belief, Defendants Ryan and John Does 1-20 did not follow established police procedure prior to seeking the arrest of Plaintiff for two counts of aggravated harassment in the second degree and one count of stalking in the fourth degree.

120.    Upon information and belief, Defendants Ryan and John Does 1-20 knew that the arrest of Plaintiff on the charges of two counts of aggravated harassment in the second degree and one count of stalking in the fourth degree was in violation of established procedure including, *inter alia*, those established by the New York City Police Department.

121.    On or about August 10, 2004, Defendant Ryan, in concert with Defendants John Does 1-20, unlawfully arrested Plaintiff and thereafter subjected him to detention behind locked doors in the police station.  As a result of said arrest and detention, Plaintiff was subjected to great indignity, humiliation and mental distress.

30

122.    The arrest and detention of Plaintiff was illegal, void and of no effect because, upon information and belief, it was procured by Defendants Ryan and John Does 1-20 without probable cause or a reasonable basis upon which a belief in the existence of probable cause could be sustained.  Defendants Ryan and John Does 1-20 knew said arrest and detention was illegal, void and of no effect by reason of it having been procured and effected without probable cause or a reasonable basis upon which a belief in the existence of probable cause could be sustained.

123.    Thereafter based on the arrest and detention effected maliciously and without probable cause, Plaintiff was charged with the crimes of two counts of aggravated harassment in the second degree and one count of stalking in the fourth degree.   The charges were dismissed, and said prosecution was thereby terminated.

124.    By reason of said false arrest, false imprisonment and false prosecution by Defendants Ryan and John Does 1-20, Plaintiff has suffered damages as hereinabove alleged.

## TWELFTH CLAIM FOR RELIEF
### (Violation of 42 U.S.C. § 1983)

125.    Plaintiff repeats and realleges the allegations in paragraphs "1" through "124" herein.

126.    Defendants Ryan and John Does 1-20 are now, and at all times material hereto were, duly appointed, employed and acting police detectives, officers or other employees of the City of New York, a governmental subdivision of the State of New York.

127.    This action arises under the United States Constitution, particularly under the Fourth, Sixth and Fourteenth Amendments thereto, and under 42 U.S.C. § 1983.

128.    Each and all of the acts of Defendants Ryan and John Does 1-20 hereinabove alleged were done by each of them, not as individuals, but under the color and pretense of the

31

statutes, ordinances, regulations, customs and usages of the State of New York and the City of New York and under authority of their office as police detectives, officers and other employees of such state and county.

129.     By reason of the conduct of Defendants Ryan and John Does 1-20 as hereinabove alleged, Plaintiff was charged with two counts of aggravated harassment in the second degree and one count of stalking in the fourth degree and held overnight at the New York City Police Department, 19th Precinct.  Plaintiff was subjected to great indignity, humiliation, discomfort and pain.

130.     Thereafter, by reason of the conduct of Defendants Ryan and John Does 1-20, as hereinabove alleged, Plaintiff was charged with the crimes of two counts of aggravated harassment in the second degree and one count of stalking in the fourth degree.   The charges were dismissed, and said prosecution was thereby terminated.

131.     The conduct of Defendants Ryan, John Does 1-20 and each of them, including that of the unlawful arrest, detention and imprisonment of Plaintiff, as hereinabove alleged, deprived Plaintiff of the following rights, privileges and immunities secured to him by the Constitution of the United States:

> a.  The right of Plaintiff to be secure in his person and effects against unreasonable search and seizure under the Fourth and Fourteenth Amendment to the Constitution of the United States; and
>
> b.  The right of Plaintiff not to be deprived of life, liberty, or property without due process of law, secured by the Fourteenth Amendment to the Constitution of the United States.

32

132.   By reason of the conduct of Defendants Ryan, John Does 1-20 and each of them, including that of the unlawful arrest, detention and imprisonment of Plaintiff, Plaintiff suffered damages as hereinabove alleged.

### THIRTEENTH CLAIM FOR RELIEF
### (Conspiracy to Violate 42 U.S.C. § 1983)

133.   Plaintiff repeats and realleges the allegations in paragraphs "1" through "132" herein.

134.   This action arises under the United States Constitution, particularly under the Fourth, Sixth and Fourteenth Amendment thereto and under Title 42 of the United States Code, Section 1983.

135.   Upon information and belief, Defendants Bernstein and Kuehbeck procured the assistance of Defendants Ryan and John Does 1-20 and, as hereinabove alleged, acted in concert with said persons to procure the unlawful arrest, detention and prosecution of Plaintiff.

136.   In doing the acts complained of, Defendants Bernstein and Kuehbeck were each a conspirator together with Defendants Ryan and John Does 1-20 and others engaged in a scheme and conspiracy designed and intended to deprive Plaintiff of such rights, privileges and immunities secured to Plaintiff by the Constitution of the United States as are hereinbefore alleged to have been violated.  Such activity by Bernstein and Kuehbeck caused Plaintiff damage as hereinabove alleged.

### FOURTEENTH CLAIM FOR RELIEF
### (Libel and Slander)

137.   Plaintiff repeats and realleges the allegations in paragraphs "1" through "136" herein.

33

138.   In a statement quoted by the New York Post and published on January 6, 2005,

defendant Jonathan Abady, purporting to represent Defendants Bernstein and Kuehbeck as

counsel, said the following:

> This complaint is an outrageous falsehood and was filed in a clear
> effort to extract money from an internationally respected author
> and journalist and to slander a wonderful woman. Carl Bernstein
> and his wife have filed formal complaints against Mr. Silver with
> the NYPD and the Manhattan DA's office for making death threats
> against them, continual harassment and stalking, and other abusive
> conduct.  We are anxious for the truth to be known about Mr.
> Silver's motivations and actions - including his record of bizarre
> and violent behavior against others as well.

139.   This statement was materially false in a number of respects including, but not

limited to, the following.  First, the statement represents that Defendants Bernstein and Kuehbeck

filed more than one "formal" complaint against Plaintiff.  Upon information and belief, only one

was filed.  Second, the statement implies that criminal proceedings are ongoing against Plaintiff.

Upon information and belief, there are no such proceedings, the only one being the proceeding

that was dismissed on the record at the request of the District Attorney's office in light of

overwhelming evidence clearly establishing that Defendants had perjured themselves.  Third, the

statement claims that one or more complaints were filed against Plaintiff for "making death

threats" against Defendants.  Upon information and belief, no such complaints were ever made.

Moreover, Plaintiff never made any such threats.

140.   Defendant Abady made this statement knowing that they were utterly baseless and

false.

141.   Defendant Abady's statement sought to defame Plaintiff and caused Plaintiff to

suffer damage to his reputation, and also caused him mental and emotional distress and suffering.

142.    Accordingly, Defendant Abady is liable to Plaintiff for damages including, but not
limited to, damage to his reputation, and pain and suffering.

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a.  Against Defendants Carl Bernstein and Christine Kuehbeck on his First,
    Second, Third, Fourth, Seventh, Eighth, Ninth, Tenth and Thirteenth
    Claims for Relief, in the amount of three million dollars ($3,000,000).

b.  Against Defendants Carl Bernstein and Christine Kuehbeck on his Fifth
    Claim for Relief, damages in the amount in excess of two hundred fifty
    thousand dollars ($250,000.00).

c.  Against Defendants Carl Bernstein and Christine Kuehbeck on his Sixth
    Claim for relief, in an amount in excess of one hundred fifty thousand
    dollars ($150,000.00).

d.  Against Defendants Ryan and John Does 1-20 on his Eleventh and
    Twelfth Claims for Relief, in the amount of three million dollars
    ($3,000,000.00).

e.  Against Defendant Abady on his Fourteenth Claim for Relief, in the
    amount of three million dollars ($3,000,000.00)

f.  Against all of the Defendants for punitive damages, in the amount of ten
    million dollars ($10,000,000.00);

g.  For its reasonable attorneys fees and costs and disbursements of this
    action; and

h.  For such other and further relief as this Court deems just and proper.

### *DEMAND FOR A TRIAL BY JURY*

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands
a trial by jury on all issues in this action.

Dated:     New York, New York
              February 8, 2005

                            HELLER, HOROWITZ & FEIT, P.C.

By: _____
                            Maurice W. Heller (MH-7996)
                            May Orenstein (MO-2948)
                            292 Madison Avenue
                            New York, New York 10017
                            (212) 685-7600

                            Attorneys for Plaintiff

## VERIFICATION

STATE OF NEW YORK         )
                                      ss.:

COUNTY OF NEW YORK     )

Jeffrey Silver, being duly sworn, deposes and says:

I am the plaintiff in this action, and I have read and know the contents of the foregoing

Verified First Amended and Supplemental Complaint. The Verified First Amended and

Supplemental Complaint is true to my own knowledge, except as to matters alleged upon

information and belief, and as to those matters I believe it to be true.

Sworn to before me
this 8th day of February, 2005.

_____
              Notary Public

                                     _____
                                          Jeffrey Silver

MAURICE W. HELLER
Notary Public, State of New York
No. 02HE4927424
Qualified in New York County
Commission Expires March 21, 20__