UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JEFFREY SILVER,

                                        Plaintiff,

                                                                    05 Civ. 35 (RPP)

                    - against -

                                                            **OPINION AND ORDER**

CHRISTINE KUEHBECK, THOMAS RYAN,
CARL BERNSTEIN, JOHN DOES 1 THROUGH 20,
and JONATHAN ABADY,

                                        Defendants.
------------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

        Jeffrey Silver ("Silver") brings this civil action against Christine Kuehbeck

("Kuehbeck"), Carl Bernstein ("Bernstein"), Detective Thomas Ryan ("Detective Ryan"),

John Does 1 through 20, and Jonathan Abady ("Abady").  The Verified First Amended

and Supplemental Complaint (the "Complaint") asserts fourteen claims against the

Defendants arising out of an alleged campaign orchestrated by Bernstein to stalk, harass,

defame, and interfere with Silver's business relationships and private communications.[1]

Kuehbeck, Bernstein, Abady, and Detective Ryan have moved pursuant to Rule 12(b)(6)

of the Federal Rules of Civil Procedure to dismiss the claims against them for failure to

state a cause of action.  For the reasons set forth below, the motions to dismiss are

granted as to each and every claim asserted in the Complaint.

**BACKGROUND**

        The Complaint alleges the following facts, which the Court must accept as true

for the purpose of deciding these motions.  Conley v. Gibson, 355 U.S. 41 (1957).

---

[1] Except for the Twelfth claim for relief for violation of 42 U.S.C. § 1983, the Complaint is
founded on diversity, alleging that Silver is a citizen of Nevada and that the Defendants are citizens of New
York.  28 U.S.C. § 1332(a)(1).  The Court will apply New York law.  See Erie R.R. v. Tompkins, 304 U.S.
65, 78 (1938).

Silver and Kuehbeck began to date in 1993, and thereafter they were close friends and some-time lovers. (Complaint "Compl." ¶¶ 21-22.) Silver and Kuehbeck were also engaged in a business relationship in which Silver provided investment advice to Kuehbeck and served as a paid consultant to the law firm that acted as plaintiffs' counsel in a securities fraud class action lawsuit conceived of and organized by Silver in which Kuehbeck was the lead plaintiff. (Id. ¶ 22.)

Silver's relationship with Kuehbeck is alleged to have continued even after she became romantically involved with Bernstein in the spring of 2002. (Id. ¶ 13, 25.) Bernstein was aware of Silver's relationship with Kuehbeck and, on or about June 19, 2002, Silver received a letter from Ira Garr, a lawyer claiming to represent Bernstein and Kuehbeck, stating that Silver was stalking and harassing them. (Id. ¶ 26.) When Silver allegedly confronted Kuehbeck about the letter, she denied knowing anything about it and told him that Mr. Garr did not represent her. (Id. ) Silver replied twice to the letter but never received a response from Mr. Garr. (Id.)

Silver and Kuehbeck are alleged to have continued their romantic relationship during the fall of 2002 and into 2003. (Id. ¶ 27.) On June 12, 2003, Silver wrote a letter to Bernstein at Kuehbeck's request, which referred to the securities class action lawsuit and requested that Bernstein stay out of Silver's and Kuehbeck's legal affairs. (Id. ¶ 28.)

Kuehbeck told Plaintiff about a July 4, 2003 holiday weekend in Iceland but neglected to tell Plaintiff that she and Bernstein were purportedly married during that trip. (Id. ¶ 30.) Upon learning of the marriage, Silver alleges that he suggested to Kuehbeck that his relationship with her should end, but they continued to meet throughout late 2003 and early 2004. (Id.) In the months following the wedding, Bernstein heightened his

surveillance of Silver and Kuehbeck.  (Id. ¶ 31.)  On January 15, 2004, at Kuehbeck's urging, Silver wrote another letter to Bernstein demanding that he stop interfering with Silver's and Kuehbeck's business affairs.  (Id.)  Silver and Kuehbeck continued to see each other regularly during this time.  (Id. ¶ 32.)

In late June 2004, a letter was hand-delivered to Silver at the apartment where he stayed while he was in New York City.  (Id. ¶ 33.)  Silver determined that the letter was from Bernstein and returned it unopened.  (Id.)  Silver later discovered that the letter contained a "Notice of Revocation of Power of Attorney," purportedly signed by Kuehbeck.  (Id. ¶ 35.)  Bernstein is alleged to have drafted the document and "compelled Kuehbeck to sign through a combination of threats and the refusal to comply with obligations of their pre-nuptial agreement."  (Id. ¶ 35.)  In addition, Silver learned from Wolf Popper LLP, the law firm handling the class action securities lawsuit brought in Kuehbeck's name, that Bernstein had begun urging the firm to ignore and cease dealing with Silver.  (Id. ¶ 34.)  As a result of the revocation of Silver's power of attorney, Silver was unable to continue serving as a consultant to Wolf Popper LLP.  (Id. ¶ 35.)

On June 20, 2004, Silver wrote to Bernstein demanding that he "stay away from me," and warning Bernstein of possible civil and criminal consequences if he persisted in his activities.  (Id. ¶ 37.)

On the afternoon of July 17, 2004, Silver went for a swim at a lake after Kuehbeck had advised him that she and Bernstein would be visiting the lake later that day.  (Id. ¶ 38.)  The Complaint summarizes the encounter that took place after Silver finished his swim as follows:

> [A]s [Silver] was walking back from the Lake, at approximately 1:15 p.m., he saw Kuehbeck and Bernstein walking toward him.  Kuehbeck

immediately ducked into the ladies room.  Bernstein then approached
[Silver], and said, in a threatening voice, "you and I are taking a walk."
[Silver] told Bernstein that he had nothing to say to him, and kept walking.
As [Silver] walked away, Bernstein turned to [Silver] and said "I'm going
to have you taken care of."  [Silver] felt threatened.

(Id.)  Silver allegedly feared for his safety and filed a complaint at the New York Police

Department's 19th Precinct with a Detective Morales.  (Id. ¶ 39.)

On July 29, 2004, less than two weeks after the incident at the lake, it is alleged

that Kuehbeck and Silver met at the same lake "to go swimming, which led, inevitably, to

sex."  (Id. ¶ 40.)  Three days later, on August 2, 2004, Kuehbeck informed Silver that

Bernstein had found out about their meeting at the lake, and Silver and Kuehbeck agreed

to meet the next day to discuss the matter.  (Id. ¶ 41.)  However, on August 3, 2004,

Kuehbeck failed to meet Silver at the agreed-upon time and place.  (Id. ¶ 42.)  They

arranged to meet two other times that day, but Kuehbeck failed to appear both times.  (Id.

¶ 42.)

On the following day, August 4, 2004, a police report was filed by Bernstein and

Kuehbeck with the 19th Precinct in Manhattan accusing Silver of "aggravated

harassment" and "stalking" against Kuehbeck.  (Id. ¶ 43.)  On the following Monday,

August 9, 2004, Detective Ryan and another detective visited Silver at an office used

part-time by Silver and told the receptionist that they wanted to speak to Silver to

"'follow up on his earlier complaint.'"  (Id. ¶ 44.)  Plaintiff eventually walked downstairs

and asked the two detections "what was up," and they asked Silver to accompany them to

the police station.  (Id.)  At the police station, Detective Ryan told Silver that he was

going to arrest him for "stalking and harassment."  (Id.)  However, after Silver explained

that five days earlier he had met and had consensual sex with Kuehbeck and after he

played a message Kuehbeck left on Silver's answering machine arranging their recent swim at the lake, Detective Ryan permitted him to leave without arrest. (Id.)

On August 10, 2004, one day after Silver spoke with Detective Ryan, Silver decided to return to the 19th Precinct to offer additional evidence that Kuehbeck's complaint against him was baseless. (Id. ¶ 45.) The following scene is alleged to have occurred:

> Detective Ryan told [Silver] that he had called Kuehbeck and Bernstein, and Bernstein had claimed [Silver] was the subject of an arrest warrant in California, a slanderous fabrication. He then told [Silver] that Bernstein and Kuehbeck wished to press charges, and that he therefore had no choice but to arrest [Silver]. [Silver] asked the precise basis upon which he was being arrested, and Ryan answered that it was on the basis of "many threatening phone messages." [Silver], puzzled, asked Detective Ryan if he found such supposed messages threatening, and Ryan replied "not to my ears, but when a woman is involved we tend to bend over backwards." Upon information and belief, there were no such "messages." Ryan then said that "Bernstein is all over the case, and I'm going to recommend that the ADA interview her separately." He declined to delay his decision pending an investigation of the actual facts. [Silver] was placed in a detention area in the police station behind a locked door, until his release later that day.

(Id.; But cf. Compl. ¶ 121[2].)

On August 19, 2004, Kuehbeck executed an affidavit at the Manhattan District Attorney's Office in which she swore, inter alia, that Silver had stalked her during the ten years after they had an only brief relationship in 1994, and that Silver had threatened her and Bernstein. (Id. ¶ 46.) Silver alleges that "[e]ach and every element of her sworn statement is a fabrication." (Id.) On August 20, 2004, Judge Anthony Ferrara issued an order of protection ordering Silver to stay away from Kuehbeck and Bernstein, which was served on Plaintiff on August 23, 2004. (Id. ¶ 47.)

---

[2] The Complaint also states inconsistently that Plaintiff was held overnight at the 19th Precinct. ¶ 129.

During the next three months, Silver organized a defense, hired counsel, and investigated his situation, which resulted in a presentation of the actual facts to the District Attorney's Office that suggested that Kuehbeck had not been truthful. (Id. ¶ 48.) In view of the evidence presented by Silver, the District Attorney's Office confronted Kuehbeck. (Id. ¶ 49.) Silver alleges that he "was eventually directly told that this meeting was 'not pleasant' for Kuehbeck, and . . . that they had finally realized they had 'lying woman on their hands.'" (Id.) The charges against Silver were then dismissed and the order of protection was vacated. (Id.)

On January 6, 2005, two days after Silver initiated this action by filing the original complaint in this Court, the New York Post published an article about Silver's filing of the complaint that included the following quotation from Defendant Jonathan Abady, an attorney retained to represent Kuehbeck and Bernstein in the action:

> This complaint is an outrageous falsehood and was filed in a clear effort to extract money from an internationally respected author and journalist and to slander a wonderful woman. Carl Bernstein and his wife have filed formal complaints against Mr. Silver with the NYPD and the Manhattan DA's office for making death threats against them, continual harassment and stalking, and other abusive conduct. We are anxious for the truth to be known about Mr. Silver's motivations and actions—including his record of bizarre and violent behavior against others as well.

(Id. ¶ 138.) On February 9, 2005, Silver filed the First-Amended Complaint, which added Abady as a defendant and added a claim against him for libel and slander based on Abady's comments quoted in the newspaper article.

In sum, the Complaint asserts a total of fourteen claims for relief: (1) malicious prosecution by Kuehbeck and Bernstein; (2) abuse of process by Kuehbeck and Bernstein; (3) intentional infliction of emotional distress by Kuehbeck and Bernstein; (4) prima facie tort by Kuehbeck and Bernstein; (5) tortious interference with business

relations by Kuehbeck and Bernstein; (6) <u>quantum meruit</u>; (7) assault by Bernstein; (8) negligence by Bernstein; (9) slander by Bernstein; (10) slander by Kuehbeck; (11) malicious prosecution and false arrest and imprisonment by Detective Ryan and John Does 1-20; (12) violation of 42 U.S.C. § 1983 by Detective Ryan and John Does 1-20; (13) conspiracy to violate 42 U.S.C. § 1983 by Kuehbeck and Bernstein; and (14) libel and slander by Abady.

**DISCUSSION**

**I.      Standard for Motion to Dismiss**

A court reviewing a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. <u>Schnall v. Marine Midland Bank</u>, 225 F.3d 263, 266 (2d Cir. 2000). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." <u>Villager Pond, Inc. v. Town of Darien</u>, 56 F.3d 375, 378 (2d Cir. 1995) (internal quotation marks omitted). A complaint should not be dismissed under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Shakur v. Selsky</u>, 391 F.3d 106, 112 (2d Cir. 2004) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)). A court must limit its review to the complaint, documents attached or incorporated by reference thereto, and "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." <u>Rothman v. Gregor</u>, 220 F.3d 81, 88 (2d Cir. 2000).

**II.     Kuehbeck's and Bernstein's Motion to Dismiss**

For purposes of clarity, this Opinion will group Silver's claims for relief against Kuehbeck and Bernstein into three categories.  The first category includes claims arising from Silver's August 2004 arrest.  The second category includes claims arising from Kuehbeck's withdrawal of the power of attorney in June 2004.  The third category includes other tort claims arising from Kuehbeck's and Bernstein's actions affecting Silver.

**A.  Claims Arising From Silver's August 2004 Arrest**

1.  Malicious Prosecution

Silver's First Claim for Relief for malicious prosecution arises Plaintiff's claim that Kuehbeck swore to a criminal complaint and an affidavit with the Manhattan District Attorney's office accusing Silver of stalking and harassment.  (Compl. ¶¶ 46, 52-54.)  Silver claims that Kuehbeck knew that the allegations were false and intended to case Silver's arrest.  (Id. ¶ 55).  According to the Complaint, Bernstein acted in concert with Kuehbeck and determined that the false sworn complaint and affidavit would be filed.  (Id. ¶ 56.)

"Under New York law, a plaintiff suing for malicious prosecution must establish: (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions."  Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995).

Kuehbeck and Bernstein dispute the sufficiency of the allegations with respect to the first element of malicious prosecution—the initiation of a "criminal proceeding"

against Silver. The New York Court of Appeals discussed this element of malicious prosecution in Broughton v. State:

> The essence of malicious prosecution is the perversion of proper legal procedures. Thus, it has been held that some sort of prior judicial proceeding is the sine qua non of a cause of action in malicious prosecution. Such a judicial proceeding may be either an evaluation by a Magistrate of an affidavit supporting an arrest warrant application, or an arraignment or an indictment by a Grand Jury.

37 N.Y.2d 451, 457 (1975) (citation omitted). Thus, a malicious prosecution "may arise only after an arraignment or indictment or some other 'evaluation by a neutral body that the charges [were] warranted.'" Stile v. City of New York, 172 A.D.2d 743, 743, 569 N.Y.S.2d 129 (2d Dept. 1991) (quoting Broughton, 37 N.Y.2d at 459).

Here, the Complaint does not allege that Silver was arraigned, indicted, or that an arrest warrant was evaluated by a Magistrate; it states only that "[o]n or about August 4, 2004, Defendant Kuehbeck swore to a criminal complaint." (Compl. ¶ 52.) Silver contends that this allegation is sufficient to plead the first element of a malicious prosecution claim because, under Section 100.5 of the New York Criminal Procedure Law,[3] the filing of an accusatory instrument, such as a misdemeanor complaint, is the procedural equivalent of an indictment insofar as both commence a criminal action.

---

[3] This section of the New York Criminal Procedure Law, entitled "Commencement of action; in general," states the following:

> A criminal action is commenced by the filing of an accusatory instrument with a criminal court, and if more than one such instrument is filed in the course of the same criminal action, such action commences when the first of such instruments is filed. The only way in which a criminal action can be commenced in a superior court is by the filing therewith by a grand jury of an indictment against a defendant who has never been held by a local criminal court for the action of such grand jury with respect to any charge contained in such indictment. Otherwise, a criminal action can be commenced only in a local criminal court, by the filing therewith of a local criminal court accusatory instrument, namely:
>
> 1. An information; or

Plaintiff points to no holding by any court that the first element of a civil claim for malicious prosecution is satisfied when a complaint is sworn to by the complaining party. Thus, under the New York decisions, the threshold trigger for the tort of malicious prosecution is a judicial proceeding where the charges against the accused are reviewed and evaluated by a neutral body. Broughton, 37 N.Y.2d at 459 (emphasis added). A Magistrate's evaluation of an affidavit supporting an arrest warrant application, an arraignment, and an indictment by a Grand Jury each involve some kind of "evaluation by a neutral body that the charges [were] warranted." Stile, 172 A.D.2d 743. The pleading in the complaint of a sworn complaint and an affidavit against Silver are not shown to have involved any evaluation by a neutral body. Furthermore, as stated in Broughton, the essence of the claim for malicious prosecution is the perversion of the legal process thereafter. 37 N.Y.2d at 457.

Silver argues that, as a result of the actions taken by Bernstein and Kuehbeck, he "suffered damages including, but not limited to, (i) legal fees and expenses incurred in his defense, (ii) damage to his reputation in the business community, and (iv) pain and suffering." (Compl. ¶ 64.) The Second Circuit noted in Bender v. City of New York that under New York law, "damages for malicious prosecution are to compensate for injuries *after* arraignment." 78 F.3d 787, 793 n.3 (2d Cir. 1996) (emphasis added) (citing Hygh v. Jacobs, 961 F.2d 359, 366 (2d Cir. 1992); Dabbs v. State, 59 N.Y.2d 213, 218 (1983)). Because Silver has not pleaded that he was arraigned on the complaint in the instant case,

---

2. A simplified information; or

3. A prosecutor's information; or

4. A misdemeanor complaint; or

5. A felony complaint.

N.Y. Crim. Proc. Law § 100.5.

he has not pleaded a claim for damages for malicious prosecution. Therefore, his First Claim for Relief for malicious prosecution is dismissed.

    2.  <u>Abuse of Process</u>

Silver's Second Claim for Relief alleges that Kuehbeck and Bernstein "used regularly issued criminal process, namely a criminal complaint and an affidavit, for the purpose of procuring [Silver's] arrest, detention, and prosecution" and that they did so "with the intent of doing harm to [Silver]" and "to obtain a collateral objective." (Compl. ¶¶ 66-68.)

"Abuse of process" is defined as "the improper and tortious use of a legitimately issued court process to obtain a result that is either unlawful or beyond the process's scope." <u>Black's Law Dictionary</u> 10 (7th ed. 1999). Under New York law, abuse of process has three essential elements: "(1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective." <u>Curiano v. Suozzi</u>, 63 N.Y.2d 113, 116 (1984). In addition, a plaintiff bringing an abuse of process claim must allege special damages. <u>See</u> <u>Bd. of Educ. v. Farmingdale Classroom Teachers Ass'n</u>, 38 N.Y.2d 397, 405 (1975).

Kuehbeck and Bernstein first dispute the sufficiency of the allegations with respect to the third element of an abuse of process claim—use of process in a perverted manner to obtain a collateral objective. In <u>Jones v. Maples/Trump</u>, No. 98 Civ. 7132 (SHS), 2002 U.S. Dist. LEXIS 3175 (S.D.N.Y. Feb. 26, 2002), Judge Stein explained what a Complaint must allege to plead adequately this element of an abuse of process claim.

Not every use of process motivated by selfishness or maliciousness gives rise to an abuse of process claim. See Curiano, 63 N.Y.2d at 117 (citing Hauser v. Bartow, 273 N.Y. 370, 374, 7 N.E.2d 268 (1937) ("Every one has a right to use the machinery of the law, and bad motive does not defeat that right.")). There must be an abuse of process which has as its direct object an effect outside the intended scope of operation of the process employed. Compare Curiano, 63 N.Y.2d at 116 (no abuse of process where defendant initiated libel action with dual purpose of punishing free speech and electoral participation and inflicting expense and burden), and Hauser, 273 N.Y. at 374 (no abuse of process where the defendant initiated incompetency proceeding with dual purpose of damaging the alleged incompetent and enriching herself), with Board of Educ. v. Farmingdale Classroom Teachers Ass'n, 38 N.Y.2d 397, 404, 343 N.E.2d 278, 380 N.Y.S.2d 635 (1975) (abuse of process where the defendant subpoenaed 87 of school district's teachers to testify on the same day with purpose of inflicting economic harm on the school district) and Dean v. Kochendorfer, 237 N.Y. 384, 390, 143 N.E. 229 (1924) (abuse of process where magistrate issued an arrest warrant for disorderly conduct with purpose of bringing arrested person into court for an unrelated disciplinary rebuke). Thus, without an allegation that the process has been improperly perverted "after" its issuance, a claim of abuse of process must be dismissed, even though the defendant acted maliciously in initiating the process. Curiano, 63 N.Y.2d at 117.

Id. at *23-24 (emphasis in original).

Here, the Complaint alleges that Kuehbeck and Bernstein "used" criminal process "for the purpose of procuring [Silver's] arrest, detention and prosecution"; "with the intent of doing harm to [Silver]"; and "in a perverted manner to obtain a collateral objective." (Compl. ¶¶ 66-68.) The Complaint alleges that Kuehbeck and Bernstein "coldly conspired to do [Silver] grievous harm, and concocted a vicious scheme designed quite simply to destroy [Silver], his reputation, career and very life." (Id. ¶ 9.) These conclusory allegations are not sufficient to adequately plead a claim of abuse of process. See Wynder v. McMahon, 360 F.3d 73, 80 (2d Cir. 2004) (observing that, regardless of the complaint's satisfaction of the generous requirements of Rule 8(a)(2), a Rule 12(b)(6) motion will "lie to permit each particular defendant to eliminate those causes of action as

to which no set of facts has been identified that support a claim against him") (emphasis omitted). Since Plaintiff's pleadings have not identified how Defendants used court process after its issuance to cause grievous harm to Silver, Silver's abuse of process claim against Kuehbeck and Bernstein is dismissed.

Kuehbeck and Bernstein also dispute the sufficiency of the allegations with respect to special damages. In opposition, Silver contends that the Complaint satisfies this pleading requirement because, even though the damages attributed to Kuehbeck's and Bernstein's abuse of process is included together with eight other causes of action for a total of three million dollars ($3,000,000), this amount is "specifically identified and causally related to the allegedly tortious conduct." (Silver Opp. Mem. at 12.) As Kuehbeck and Bernstein point out, however, courts have dismissed special damages claims where, as here, a complaint "sets forth damages in round numbers." Vigoda v. DCA Prods. Plus, Inc., 293 A.D.2d 265, 266, 741 N.Y.S.2d 20 (1st Dept. 2002); Ann-Margret v. High Society Magazine, Inc., 498 F. Supp. 401, 408 (S.D.N.Y. 1980). Thus, Silver's abuse of process claim also fails with respect to his allegations of damages.

3. Intentional Infliction of Emotional Distress

Silver's Third Claim for Relief alleges that Kuehbeck and Bernstein intentionally inflicted emotional distress by engaging in a course of conduct that was "extreme and outrageous," with the intent or knowledge that their conduct would cause the distress and suffering of Silver. (Compl. ¶ 72.)

To state a valid claim for intentional infliction of emotional distress ("IIED") under New York law, a plaintiff must show: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct

and the injury, and (4) severe emotional distress." <u>Bender v. City of New York</u>, 78 F.3d 787, 790 (2d Cir. 1996); see also <u>Howell v. New York Post Co., Inc.</u>, 81 N.Y.2d 115, 121 (1993).

Kuehbeck and Bernstein dispute the sufficiency of the allegations with respect to the first element of Silver's IIED claim—that the conduct complained of was "extreme and outrageous." To satisfy this element, New York law requires that their alleged conduct must have been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." <u>Murphy v. American Home Prods. Corp.</u>, 58 N.Y.2d 293, 303 (1983). Even assuming that all of Silver's factual allegations are true, and resolving all ambiguities and drawing all inferences in Silver's favor, the conduct alleged in the Complaint does not meet this test and is insufficient to support an IIED claim. Accordingly, this claim is dismissed.

4. <u>Negligence</u>

Silver's Eighth Claim for Relief alleges that Silver suffered injuries that were proximately caused by Bernstein when he "negligently failed to use ordinary care in investigating Kuehbeck's charges before participating in any scheme to file such complaint and affidavit and procuring [Silver's] arrest, detention and prosecution." (Compl. ¶¶ 96-97.)

In order to prevail on a negligence claim under New York law, a plaintiff must establish "(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." <u>Akins v. Glens Falls City Sch. Dist.</u>, 53 N.Y.2d 325, 333 (1981). The existence of a duty of care is a "legal, policy-

laden declaration reserved for Judges to make prior to submitting anything to fact-finding or jury consideration." Palka v. Servicemaster Mgmt. Servs. Corp., 83 N.Y.2d 579, 585 (1994). "Absent a duty running directly to the injured person there can be no liability in damages, however careless the conduct of foreseeable the harm." 532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Center, Inc., 96 N.Y.2d 280, 289 (2001).

At issue here is whether Bernstein owed a duty of care to Silver. Silver contends that the claim against Bernstein should not be dismissed because "it is clear that as citizens of a civil society we each owe an ordinary duty of care to our fellow man not to behave in this manner and furthermore, to investigate the truthfulness of a criminal complaint before swearing one out against an innocent man." (Silver Opp. Mem. at 19.) However, Silver fails to cite any cases or other authority that establish the existence of such a duty. Silver's negligence claim therefore is dismissed.

    5.  Conspiracy to Violate 42 U.S.C. § 1983

Silver's Thirteenth Claim for Relief alleges that Kuehbeck and Bernstein conspired with Detective Ryan and John Does 1-20 to deprive Silver of his rights, privileges, and immunities under the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983 ("Section 1983"). (Compl. ¶¶ 134-35.) In particular, Kuehbeck and Bernstein allegedly "procured the assistance of Defendants Ryan and John Does 1-20 and . . . acted in concert with said persons to procure the unlawful arrest, detention and prosecution of [Silver]." (Id. ¶ 135.)

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins,

487 U.S. 42, 48 (1988). Private persons can only be subject to liability under Section 1983 if they were "jointly engaged with state officials in the challenged action." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (quoting Dennis v. Sparks, 449 U.S. 24, 27-28 (1980)).

Kuehbeck and Bernstein contend that this claim should be dismissed because the Complaint does not adequately allege that they conspired with Detective Ryan or acted in concert with him to deprive Silver of his civil rights. "[M]erely filing a complaint with the police, reporting a crime, requesting criminal investigation of a person, or seeking a restraining order, even if the complaint or report is deliberately false, does not give rise to a claim against the complainant for a civil rights violation." Vazquez v. Combs, No. 04 Civ. 4189 (GEL), 2004 U.S. Dist. LEXIS 22137, at *11 (S.D.N.Y. Oct. 22, 2004). See also Jones v. Maples/Trump, 2002 U.S. Dist. LEXIS 3175, at *16 (S.D.N.Y. Feb. 26, 2002) ("providing false information to an arresting officer is not, by itself, sufficient to state a claim against [a] private party under § 1983"); Lugar v. Edmonson Oil Co., 457 U.S. 922, 939 n.21 (1983) (merely invoking state legal procedures against another private person does not constitute "joint participation" or "conspiracy" with state officials so as to satisfy the § 1983 requirement of action under color of law).

Here, the Complaint alleges that Detective Ryan told Silver that he had called Kuehbeck and Bernstein, that they told him they "wished to press charges," and that "'Bernstein is all over the case.'" (Compl. ¶ 45) Such allegations do not show conspiracy or actions in concert that are necessary to establish a § 1983 violation; otherwise complainants in all arrests could be subject to retaliatory § 1983 actions.

The Complaint further alleges that Kuehbeck and Bernstein "utilized [Bernstein's] influence with the New York City Police to procure [Silver's] arrest," and that the police department "followed Bernstein's and Kuehbeck's instructions with respect to whether to arrest [Silver], when and where to arrest him, and what to charge him with." (Compl. ¶ 57.) Such conclusory allegations are not sufficient to state a claim for a § 1983 conspiracy. Furthermore, they are not consistent with the Complaint's rendition of the events immediately preceding Silver's arrest, specifically the allegation that Silver returned to the 19th Precinct of his own volition on the day of his arrest. See First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2d Cir. 1994) ("Courts do not accept conclusory allegations on the legal effect of the events plaintiff has set out if these allegations do not reasonably follow from his description of what happened."). Accordingly, Silver's § 1983 conspiracy claim against Kuehbeck and Bernstein is dismissed.

**B. Claims Arising From Kuehbeck's Withdrawal of the Power of Attorney in June 2004**

1. Tortious Interference with Business Relations

Silver's Fifth Claim for Relief alleges that in June 2004 Kuehbeck and Bernstein tortiously interfered with his contractual and business relations with Wolf Popper LLP, the law firm representing the plaintiffs in a class action securities fraud lawsuit in which Kuehbeck was the lead plaintiff. The Complaint alleges that Plaintiff had invested for Kuehbeck in Genesis Microchip, Inc., whose shares dropped sharply. (Compl. ¶ 22.) The Complaint also alleges that Plaintiff conceived and organized a class action lawsuit against the company, hired Wolf Popper LLP, and agreed to serve as a consultant (to

Wolf Popper) with Kuehbeck's knowledge and consent. (Id.) In connection with the lawsuit, Kuehbeck gave Plaintiff power of attorney to act on her behalf. (Id.)

To establish a claim for tortious interference with business relations, a plaintiff must show: "(1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship." Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 382 (2d Cir. 2000) (citing Purgess v. Sharrock, 33 F.3d 134, 141 (2d Cir. 1994)).

Kuehbeck and Bernstein first dispute the sufficiency of the allegations with respect to the first element –that a valid "business relationship" existed between Silver and Wolf Popper LLP. The Complaint alleges that Silver "agreed to serve as consultant" to Wolf Popper LLP (Compl. ¶ 22) and that he had "contractual and business relations with the Wolf Popper firm" (Id. ¶ 82). Thus, although the Complaint does not specify what Silver was to be paid, how often he would work, or what exactly he would do, the allegations are sufficient to plead the first element of this tort.

Kuehbeck and Bernstein next dispute the sufficiency of the allegations with respect to the second element – that they intentionally interfered with a business relationship between plaintiff and a third party. Silver alleges that Bernstein "orchestrat[ed] Kuehbeck's withdrawal of the power of attorney issued in favor of Plaintiff." (Compl. ¶ 82.) The withdrawal of a power of attorney is not an interference with Plaintiff's relationship with a third party, namely Wolf Popper LLP. Withdrawing her power of attorney is a decision by Kuehbeck that involves her own relationship with Silver, not the relationship of Silver and Wolf Popper. Therefore, Kuehbeck's

withdrawal of her power of attorney does not amount to intentional interference with a business relationship.

Kuehbeck and Bernstein also dispute the sufficiency of the allegations with respect to the third element – that they acted with the sole purpose of harming Silver or used dishonest, unfair, or improper means. Silver, citing Paragraphs 34 and 35 of the Complaint, contends that Kuehbeck and Bernstein "acted solely to harm [Silver] and his business relationship with Wolf Popper." (Silver Opp. Mem. at 24 (citing Compl. ¶¶ 34-35 (emphasis added)).) However, Paragraphs 34 and 35 of the Complaint, quoted below in their entirety, do not allege that Kuehbeck and Bernstein acted with such a single-minded intent.

> 34. Now, the depth of Bernstein's "investigation" into [Silver's] private affairs was becoming apparent. [Silver] also learned from Wolf Popper that prior to this period Bernstein had begun inserting himself into the class action securities suit brought in Kuehbeck's name, and had repeatedly urged them privately to ignore and cease dealing with [Silver] in any respect. [Silver] has since heard nothing from the firm.

> 35. As [Silver] discovered later, the letter contained a "Notice of Revocation of Power of Attorney," purportedly signed by Kuehbeck. Upon information and belief, the notice was drafted by Bernstein, who compelled Kuehbeck to sign through a combination of threats and the refusal to comply with obligations of their pre-nuptial agreement. This notice purported to withdraw the power of attorney that Kuehbeck had given to [Silver] in connection with activity in her behalf in the securities fraud class action and purported to discharge [Silver] from any further involvement, meaning that his agreement with Wolf Popper could no longer be performed. Not only was the letter hand delivered to [Silver], but a copy of the purported notice was faxed to one of [Silver's] unrelated business colleagues in a transparent effort to embarrass [Silver].

(Compl. ¶¶ 34-35.) Considerably later in the Complaint, Silver alleges that "Bernstein and Kuehbeck acted purposefully and knowingly and with the intent of harming [Silver]."

(Id. ¶ 83.)  The clear import of Paragraphs 34 and 35, however, is that Kuehbeck took actions to prevent Plaintiff from continuing to act as her agent.  Read as a whole, the Complaint does not imply that these Defendants' actions at Wolf Popper were taken solely to harm Plaintiff.

The Complaint further alleges that Bernstein repeatedly urged Wolf Popper LLP to ignore Silver and cease dealing with him, and that Bernstein drafted and compelled Kuehbeck to sign a "Notice of Revocation of Power of Attorney." (Compl. ¶¶ 34-35).  Silver charges that Bernstein communicated with individuals at Wolf Popper "to convince them to sever their relationship with Plaintiff in connection with the securities class action litigation in which Kuehbeck serves as name Plaintiff."  (Compl. ¶ 82.)  However, the Complaint does not allege that Kuehbeck and Bernstein used dishonest or unfair means, nor do the allegations amount to improper means.  New York's Court of Appeals has noted that "there is no liability in tort unless the means employed to effect the interference was wrongful."  Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 196 (1980).  The Court then stated that "wrongful means" include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract."  Id. at 191.  Silver's claims involve persuasion, but "mere knowing persuasion would not be sufficient."  Id. at 196.  Therefore, even assuming that all of Silver's factual allegations are true, the conduct alleged in the Complaint is insufficient to support a claim for tortious interference.  Accordingly, Bernstein and Kuehbeck's motion to dismiss the tortious interference with business relations claim is granted.

2. Quantum Meruit

Silver's Sixth Claim for Relief alleges that he is entitled to recover as damages the reasonable value of the services he has performed, at Kuehbeck's request, for Kuehbeck and the class that she represents. Specifically, the Complaint alleges that "Kuehbeck asked [Silver] to be one of her investment advisors" (Compl. ¶ 22) and that "[i]n the course of conceiving, researching and preparing the securities class action lawsuit in which Kuehbeck is the name plaintiff, [Silver] spent hundreds of hours working on Kuehbeck's behalf and on behalf of the class that Kuehbeck represents." (Compl. ¶ 87).

"In order to recover in quantum meruit, New York law requires a claimant to establish (1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." Longo v. Shore & Reich, Ltd., 25 F.3d 94, 98 (2d Cir. 1994) (internal quotation marks and citation omitted).

Kuehbeck disputes the sufficiency of the allegations with respect to the third element of Silver's quantum meruit claim – expectation of compensation. In response, Silver states in his memorandum of law that he "did not do all of this work out of the goodness of his heart without expecting some compensation in return." (Silver Opp. Mem. at 22.) However, because the Complaint alleges that Silver agreed to serve as a consultant to Wolf Popper LLP (Compl. ¶ 22) and that Silver was a long-time friend and some-time lover of Kuehbeck (Id. at ¶¶ 21-22), any claim of expectation of compensation is undercut. The Complaint does not include any allegations suggesting that Silver had a "reasonable expectancy of receiving such compensation" from Kuehbeck, Argo Marine Sys., Inc. v Camar Corp., 755 F.2d 1006, 1011 (2d Cir. 1985), this claim is dismissed.

### C.  Other Tort Claims Against Kuehbeck and Bernstein

1.  <u>Slander</u>

Silver's Ninth Claim for Relief alleges that Bernstein slandered Silver by knowingly and intentionally making disparaging and false statements about Silver to third parties, namely an individual named Ira Garr.  Bernstein allegedly stated, <u>inter alia</u>, that Silver is a "'stalker,'" that he is "'crazy,'" and that he was "'harassing'" Kuehbeck and Bernstein.  (Compl. ¶¶ 100-01.)

"The elements of a cause of action for slander under New York law are (i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) 'of and concerning' the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander <u>per se</u>, and (vii) not protected by privilege."  <u>Albert v. Loksen</u>, 239 F.3d 256, 265-66 (2d Cir. 2001).  As Judge Scheindlin explained in <u>Mobile Data Shred, Inc. v. United Bank of Switz.</u>, No. 99 Civ. 10315 (SAS), 2000 U.S. Dist. LEXIS 4252, at *19 (S.D.N.Y. Apr. 5, 2000), "[i]n evaluating the sufficiency of claims of slander, the courts in this Circuit have required that the complaint adequately identify the allegedly defamatory statements, the person who made the statements, the time when the statements were made, and the third parties to whom the statements were published."  <u>Id.</u> at *19 (citing <u>Ives v. Guilford Mills, Inc.</u>, 3 F. Supp. 2d 191, 199 (S.D.N.Y. 1998); <u>Broome v. Biondi</u>, No. 96 Civ. 805 (RLC), 1997 U.S. Dist. LEXIS 1431 (S.D.N.Y. Feb. 10, 1997); <u>Reeves v. Continental Equities Corp. of Am.</u>, 767 F. Supp. 469, 473 (S.D.N.Y. 1991)).

Silver has failed to adequately plead the slander claim against Bernstein.  The Complaint identifies only one person, Ira Garr, to whom Bernstein allegedly made

defamatory statements about Silver.  Mr. Garr was Bernstein's attorney at the time the statements were made and therefore Bernstein's communications with him were privileged.  The attorney-client privilege "requires that the asserted holder of the privilege is or sought to become a client, that the person to whom the communication was made is an attorney admitted to practice, and that the communication was made while that person was acting as an attorney.  Hydraflow v. Enidine, 145 F.R.D. 626, 630 (W.D.N.Y. 1993).  The purpose of the privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."  Upjohn Co. v. U.S., 449 U.S. 383, 398 (1981).  Here, Mr. Garr was acting as Bernstein's attorney at the time Bernstein allegedly made defamatory statements to him, and full communication between Bernstein and Garr is protected by the attorney-client privilege.  Thus, the statements were privileged and as such, the communications between Bernstein and Mr. Garr cannot serve as the basis for Silver's slander claim.  Because the Complaint does not identify any other third parties to whom Bernstein made the alleged statements about Silver,[4] this claim is dismissed.

Silver's Tenth Claim for Relief alleges that Kuehbeck slandered Silver by knowingly and intentionally making defamatory and false statements about Silver to third parties.  (Id. ¶¶ 105-06.)  Kuehbeck allegedly stated, inter alia, that Silver "'tried to kill her.'"  (Id. ¶ 105.)  The Complaint does not identify any "third parties" to whom

---

[4] Silver states that Bernstein hired Mr. Garr to write and send the letter to Silver, "as well as others."  (Silver Opp. Mem. at 26 (citing Compl. ¶ 100).)  However, the Complaint fails to identify any third parties, aside from Mr. Garr, to whom the statements about Silver were published.

Kuehbeck made the alleged statements.  Accordingly, the slander claim against Kuehbeck is dismissed.

2.  <u>Assault</u>

Silver's Seventh Claim for Relief alleges that Bernstein assaulted him when the two encountered each other on July 17, 2004.  According to the Complaint, "Bernstein approached [Silver], and said, in a threatening voice, 'you and I are taking a walk.' [Silver] told Bernstein that he had nothing to say to him, and kept walking.  As [Silver] walked away, Bernstein turned to [Silver] and said, 'I'm going to have you taken care of.'"  (Compl. ¶¶ 38, 91.)

To establish a claim for assault under New York law, a plaintiff must show "an intentional placing of another person in fear of <u>imminent</u> harmful or offensive contact." <u>Girden v. Sandals Int'l</u>, 262 F.3d 195, 203 (2d Cir. 2001) (emphasis added).  "[T]hreats, standing alone, do not constitute an assault."  <u>Carroll v. New York Property Ins. Underwriting Ass'n</u>, 88 A.D.2d 527, 527, 450 N.Y.S.2d 21, 22 (1st Dept. 1982) (citation omitted).  Bernstein's alleged comments to Silver as he was walking away and as Silver walked away do not suggest "imminent" harmful contact, and Silver makes no arguments in opposition to the motion to dismiss this claim of the Complaint.  The assault claim against Bernstein therefore is dismissed.

3.  <u>Prima Facie Tort</u>

Silver's Fourth Claim for Relief alleges that Kuehbeck and Bernstein engaged in a course of conduct comprised of various acts with the intent and purpose of causing harm to Silver, giving rise to a claim for <u>prima facie</u> tort.

"The requisite elements of a cause of action for prima facie tort are (1) the intentional infliction of harm, (2) which results in special damages, (3) without any excuse or justification, (4) by an act or series of acts which would otherwise be lawful." Freihofer v. Hearst Corp., 65 N.Y.2d 135, 142-43 (1985).

Silver's prima facie tort claim must be dismissed because it alleges no facts not included in his other claims for relief, and it completely overlaps the other claims alleged in the Complaint. To the extent that allegations provide grounds for other causes of action included in the Complaint, those allegations cannot give rise to a prima facie tort claim. See Chen v. United States, 854 F.2d 622, 628 (2d Cir. 1988) (stating that "a set of facts giving rise to a common-law tort is fatal to a prima facie tort claim"). With respect to the other allegations underlying this claim, those allegations are insufficient to adequately plead a prima facie tort claim.

Silver's prima facie tort claim must also be dismissed because the Complaint fails to plead special damages. According to the Complaint, Silver demands judgment against Kuehbeck and Bernstein on the prima facie tort claim, along with eight other claims, in the amount of three million dollars ($3,000,000). (Compl. at 35.) As already noted, courts have dismissed special damages claims where the claim, like Silver's claim, "set[] forth damages in round numbers." Vigoda v. DCA Prods. Plus, Inc., 293 A.D.2d 265, 266, 741 N.Y.S.2d 20 (1st Dept. 2002); Ann-Margret v. High Society Magazine, Inc., 498 F. Supp. 401, 408 (S.D.N.Y. 1980). Accordingly, Silver's prima facie tort claim is dismissed.

**III.    Abady's Motion to Dismiss**

Silver's libel and slander claim against Abady, the Fourteenth Claim for Relief, arises from a statement made by Abady that was quoted by a <u>New York Post</u> article.  The statement announcing that Silver had commenced this action was published two days after its filing in this Court.  Abady's statement, as quoted in the Complaint, reads as follows:

> This complaint is an outrageous falsehood and was filed in a clear effort to extract money from an internationally respected author and journalist and to slander a wonderful woman.  Carl Bernstein and his wife have filed formal complaints against Mr. Silver with the NYPD and the Manhattan DA's office for making death threats against them, continual harassment and stalking, and other abusive conduct.  We are anxious for the truth to be known about Mr. Silver's motivations and actions – including his record of bizarre and violent behavior against others as well.

(Compl. ¶ 138.)  Silver alleges that Abady's statement was materially false in a number of respects and that Abady made the statement knowing that it was false and with the intent to defame Silver, to cause damage to Silver's reputation, and to cause Silver mental and emotional distress and suffering.  (<u>Id.</u> ¶¶ 139-41.)

Section 74 of the New York Civil Rights Law ("Section 74") provides, in relevant part, that "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding."  N.Y. Civil Rights Law § 74.  "For a report to be characterized as 'fair and true' within the meaning of the statute . . . it is enough that the substance of the article be substantially accurate."  <u>Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.</u>, 49 N.Y.2d 63, 67 (1979).  "New York courts have extended the privilege to comments made by attorneys to the press in connection with the representation of their clients."  <u>McNally v. Yarnall</u>, 764 F. Supp. 853, 856 (S.D.N.Y. 1991) (citing <u>Branca v. Mayesh</u>, 101 A.D.2d

872, 476 N.Y.S.2d 187 (2d Dept. 1984); <u>Ford v. Levinson</u>, 90 A.D.2d 464, 454 N.Y.S.2d 846 (1st Dept. 1982)).

Abady contends that, like the comments made by the defamation defendant in <u>McNally v. Yarnall</u>, his statement is absolutely protected by Section 74 because he was merely summarizing his client's position in the litigation. (Abady Mem. at 9.) In <u>McNally</u>, the plaintiff moved to add a cause of action for libel against his opposing party's attorney based on comments the attorney made to a newspaper about the litigation. Judge Sweet denied the motion, holding that statements made by a party's attorney concerning a potential defense in a pending action were protected by Section 74. <u>See</u> <u>McNally</u>, 764 F. Supp. at 856. In reaching this conclusion, Judge Sweet explained that the attorney's comments "relate[d] directly to a possible position to be taken by [his client] as a defense to [the defamation plaintiff's] charges," and that the attorney's "alleged statement was merely restating his client's position in defending the action." <u>Id.</u>

In opposition, Silver first argues that Abady's statement is not protected by Section 74 because it falls within an exception to that privilege recognized by the New York Court of Appeals in <u>Williams v. Williams</u>, 23 N.Y.2d 592 (1969). In <u>Williams</u>, the court concluded that Section 74 was not intended to protect a party that "maliciously institutes a judicial proceeding alleging false and defamatory charges" and then publicizes those charges in the press. <u>Id.</u> at 599. However, the <u>Williams</u> exception does not apply here for the same reasons it was inapplicable in <u>McNally</u>. Unlike the defamation defendant in <u>Williams</u>, neither Abady nor Kuehbeck and Bernstein instituted the underlying litigation in order to publicize false and defamatory charges against Silver. Rather, it was Silver who instituted the litigation giving rise to Abady's statement. The

Complaint does not allege that Abady called a press conference or sought to publicize his statement in any way; in fact, there is no allegation that Abady's statement was anything other than a response to a media inquiry about the complaint filed by Silver. Furthermore, Abady's statement appeared in an article reporting on the lawsuit that discussed both sides of the controversy and identified Abady as Kuehbeck's and Bernstein's attorney.[5] Accordingly, even when accepting the allegations in the Complaint as true, the situation that gave rise to Abady's statement is distinguishable from the "unusual fact pattern" considered in Williams. Cf. McNally, 764 F. Supp. at 856 (distinguishing Williams where defamation defendant did not initiate the underlying action, did not seek publicity for the action, and the attorney's comments appeared in a balanced article about the controversy).

Silver also contends that Abady's statement is not protected by Section 74 because the statement was not a "fair and true report" of the litigation. To be privileged by Section 74, a report of a judicial proceeding must be "substantially accurate." A statement is "substantially accurate" "if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth." Zerman v. Sullivan & Cromwell, 677 F. Supp. 1316, 1322 (S.D.N.Y. 1988) (citations omitted). According to Silver, Abady's statement erroneously stated that Kuehbeck and Bernstein "have filed formal complaints" against Silver, that Silver made "death threats" against Kuehbeck and Bernstein, and that Silver has a "record of bizarre and violent behavior against others." However, in view of the entire article in which Abady's statement

---

[5] On a motion to dismiss, the Court may take judicial notice of documents such as the New York Post article that Silver "either possessed or knew about and upon which [he] relied in bringing the suit." Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000).

appeared, the Court finds that Abady's statement was a substantially accurate account of his clients' position in the litigation initiated by Silver's complaint. Accordingly, the Fourteenth Claim for Relief is dismissed.

## IV. Detective Ryan's Motion to Dismiss

Silver brings two claims against Detective Ryan. The Eleventh Claim for Relief charges Detective Ryan with malicious prosecution and false arrest in violation of New York state law,[6] and the Twelfth Claim for Relief charges Detective Ryan with malicious prosecution and false arrest in violation of Fourth, Sixth, and Fourteenth Amendment rights as secured by 42 U.S.C. § 1983.

False arrest and malicious prosecution claims brought under New York state law are "substantially the same" as § 1983 false arrest and malicious prosecution claims rooted in the Fourth and Fourteenth Amendments, Boyd v. City of New York, 336 F.3d 72, 75 (2d Cir. 2003), with the exception that § 1983 requires that the defendant act "under color of state law," Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996).[7]

To establish a false arrest claim, a plaintiff must show that: (1) the defendant intentionally confined the plaintiff; (2) the plaintiff was aware of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994); Davis v. City of New York, 373 F. Supp. 2d 322, 329 (S.D.N.Y. 2005). Probable cause to believe that the

---

[6] The Eleventh Claim for Relief also refers to false imprisonment. However, because "[i]n New York, the tort of false arrest is synonymous with that of false imprisonment," Posr v. Doherty, 944 F.2d 91, 96 (2d Cir. 1991), the Court's discussion of the false arrest claim will apply to the false imprisonment claim.

[7] Here, because the parties do not dispute that Detective Ryan was acting in his capacity as a police officer during all times relevant to this dispute, he was clearly acting "under color of state law."

plaintiff committed a crime constitutes a privilege justifying the arrest. Marshall v. Sullivan, 105 F.3d 47, 50 (2d Cir. 1996).

"To state a claim under New York law for the tort of malicious prosecution, a plaintiff must show: (1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice." Kinzer v. Jackson, 316 F.3d 139, 143 (2d Cir. 2003). For a malicious prosecution claim under § 1983, a plaintiff must also demonstrate that the defendant's conduct "result[ed] in a constitutionally cognizable deprivation of liberty." Id. at 143. Probable cause defeats a malicious prosecution claim. Boyd v. City of New York, 336 F.3d 72, 75 (2d Cir. 2003).

Thus, the lack of probable cause is an essential element of both a false arrest and a malicious prosecution claim. See Boyd, 336 F.3d at 75 ("If there was probable cause for the arrest, then a false arrest claim will fail. Similarly, if there was probable cause for the prosecution, then no malicious prosecution claim can stand.") (citation and footnote omitted). Detective Ryan seeks to dismiss the claims against him on the ground that Silver has not pleaded sufficient facts in the Complaint to establish a lack of probable cause, thus defeating the claims for false arrest and malicious prosecution. Because the "probable cause determination relevant to a malicious prosecution claim differs from that relevant to a false arrest claim," Mejia v. City of New York, 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000), these two determinations are considered separately.

### A. Probable Cause for Silver's Arrest

Probable cause to arrest exists "when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Escalara v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004) (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)). An arresting officer may rely on the report of a victim of a crime. See Loria v. Gorman, 306 F.3d 1271, 1290 (2d Cir. 2002). "Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury." Krause v. Bennett, 887 F.2d 362, 372 (2d Cir. 1989); see also Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997) (officer "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest" once reasonable basis for believing there is probable cause). That the plaintiff was found not guilty of the crimes for which he was arrested has no bearing on his false arrest claim. See Singer, 63 F.3d 110, 118 ("a favorable termination of the proceedings is not an element of [the] tort [of false arrest]"). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." Weyant, 101 F.3d at 852.

Detective Ryan argues that the false arrest claim must be dismissed because "Kuehbeck's complaint to the NYPD, in and of itself, provided the probable cause for [Silver] to have been arrested." (Ryan Mem. at 6.) According to the Complaint, "on or about August 4, 2004, Defendant Ryan conducted an interview of Bernstein and Kuehbeck during which Kuehbeck falsely alleged that [Silver] had been 'stalking' and 'harassing' her." (Compl. ¶ 113.) Silver contends that Kuehbeck's allegations, as

recounted in the Complaint, did not give rise to probable cause because, in view of the fact that that Silver had previously filed a criminal complaint with a different detective in the same police precinct (Compl. ¶ 39), Detective Ryan "knew or should have known immediately that there was a history between the parties and that this raised inherent doubts as to the veracity of the Bernstein and Kuehbeck story" (Silver Opp. at 5).

"When information is received from a putative victim or an eyewitness, probable cause exists, <u>unless the circumstances raise doubt as to the person's veracity</u>." <u>Curley v. Vill. of Suffern</u>, 268 F.3d 65, 70 (2d Cir. 2001) (emphasis added). Taking the facts alleged in the Complaint as true, there is no showing that Detective Ryan had reason to doubt Kuehbeck's veracity. Although Silver had previously filed a criminal complaint in the same precinct against Bernstein, Kuehbeck's husband (Compl. ¶ 39), Silver alleges no facts showing that Detective Ryan knew of that complaint. To be sure, the Complaint alleges that, after Detective Ryan informed Silver of Kuehbeck's criminal complaint on August 9, 2004,

> [Silver] related a number of facts to Detective Ryan, including the fact that only five days earlier, he and Kuehbeck had met at the Lake for as swim and had consensual sex. Fortunately, Kuehbeck's message arranging for the tryst was preserved on [Silver's] answering machine, and he played the message for the police. Detective Ryan was apparently surprised, and told [Silver] that he could leave because he now had to call Bernstein and Kuehbeck who were in Europe.

(Compl. ¶ 44.) However, the Complaint does not allege that Detective Ryan believed what Silver told him. Silver evidently did not reach that conclusion because he alleges that he returned to the 19th Precinct on the following day, August 10, 2004, "to try to offer additional evidence that [Kuehbeck's] complaint was nonsense." (Compl. ¶ 45.) According to the Complaint, the following unfolded:

> [Detective Ryan] then told [Silver] that Bernstein and Kuehbeck wished to
> press charges, and that he therefore had no choice but to arrest [Silver].
> [Silver] asked the precise basis upon which he was being arrested, and
> Ryan answered that it was on the basis of "many threatening phone
> messages." [Silver], puzzled, asked Detective Ryan if he found such
> supposed messages threatening, and Ryan replied "not to my ears, but
> when a woman is involved we tend to bend over backwards." Upon
> information and belief, there were no such "messages." Ryan then said
> that "Bernstein is all over the case, and I'm going to recommend that the
> ADA interview her separately." He declined to delay his decision pending
> an investigation of the actual facts. [Silver] was placed in a detention area
> in the police station behind a locked door, until his release later that day.

(Id. ¶ 45.)

In any event, the Complaint does not allege that Detective Ryan had any reason to
question Kuehbeck's veracity in her claims that Silver was stalking or harassing her.
Silver presented no evidence to demonstrate that Ryan knew of any previous complaint
filed by Kuehbeck or any history between the parties. Therefore, information received
from Kuehbeck provided Ryan with probable cause to arrest Silver, thereby defeating
Silver's false arrest claim.

### B. Probable Cause for Silver's Prosecution

Probable cause also defeats a malicious prosecution claim. See Boyd, 336 F.3d
75; see also Kinzer, 316 F.3d 143. For purposes of the tort of malicious prosecution,
probable cause has been defined as "the knowledge of facts, actual or apparent, strong
enough to justify a reasonable man in the belief that he has lawful grounds for
prosecuting the defendant in the manner complained of" or whether "a discreet and
prudent person would be led to the belief that a crime had been committed by the person
charged." Morillo v. City of New York, 1997 U.S. Dist. LEXIS 1665 at *14 (S.D.N.Y.)
(citing Loeb v. Teitelbaum, 432 N.Y.S.2d 487, 494 (1980)). "The existence of probable
cause is measured as of the time the prosecution was initiated and is based on facts

known to or believed to be true by the defendant at that time." Id. (citing 432 N.Y.S.2d at 494-95). Here, Detective Ryan had probable cause based on defendant Kuehbeck's complaint to the police that was strong enough to justify him in the belief that he had lawful grounds to arrest and prosecute Silver. Nor has Plaintiff shown that a judicial proceeding was instituted, which is the first element of a malicious prosecution claim. See supra 8-10. Accordingly, Silver's malicious prosecution claim is dismissed.


**CONCLUSION**

For the foregoing reasons, Kuehbeck and Bernstein's motion to dismiss Silver's claims for relief are granted as to the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth and Thirteenth Claims for Relief; Abady's motion to dismiss is granted as to the Fourteenth Claim for Relief; and Detective Ryan's motion to dismiss is granted as to the Eleventh and Twelfth Claims for Relief.


IT IS SO ORDERED.

Dated: New York, New York
November 7, 2005


_____
Robert P. Patterson, Jr.
U.S.D.J.

**Copies of the Opinion and Order sent to:**

*Counsel for Plaintiff Silver*

Heller Horowitz & Feit, P.C.
292 Madison Avenue
New York, New York 10017
Attn:   Maurice W. Heller
        May Orenstein
Tel:    212-685-7600
Fax:    212-696-9459

*Counsel for Defendants Kuehbeck, Bernstein, and Abady*

Emery Celli Brinckerhoff & Abady LLP
545 Madison Avenue
New York, New York 10022
Attn:   Andrew G. Celli, Jr.
        O. Andrew F. Wilson
Tel:    212-763-5000
Fax:    212-763-5001

*Counsel for Defendant Ryan*

Michael A. Cardozo
Corporation Counsel of the City of New York
100 Church Street, Room 3-196
New York, New York 10007
Attn:   Seth D. Eichenholtz, Assistant Corporation Counsel
Tel:    212-788-8684
Fax:    212-788-9776